71 U.S. 2 (____)
4 Wall. 2
EX PARTE MILLIGAN.
Supreme Court of United States.

*9 Mr. J.E. McDonald, Mr. J.S. Black, Mr. J.H. Garfield, and Mr. David Dudley Field, for the petitioner.
Mr. Speed, A.G., Mr. Stanbery, and Mr. B.F. Butler, special counsel of the United States, contra.

ON THE SIDE OF THE UNITED STATES.
I. JURISDICTION.
1. As to the jurisdiction of the Circuit Court.  The record shows that the application was made to the court in open *10 session. The language of the third section contemplates that it shall be made to a "judge."
But, independently of this, the record does not state the facts necessary to bring the case within the act of 1863. It does not show under which section of the act it is presented; nor allege that the petitioners are state or political prisoners otherwise than as prisoners of war; nor that a list has been brought in, or that it has not been brought in. If a list had been brought in containing the name of one of these petitioners, it would have been the judge's duty to inquire into his imprisonment; if no list had been brought in, his case could only be brought before the court by some petition, and the judge, upon being satisfied that the allegations of the petition were true, would discharge him. But there is no certificate in the division of opinion that the judges were or were not satisfied that the allegations of these petitioners were true; nor were the petitions brought under the provisions of that duty. But conceding, for argument's sake, this point, a graver question exists.
2. As to the jurisdiction of this court.  If there is any jurisdiction over the case here, it must arise under the acts of Congress which give to this court jurisdiction to take cognizance of questions arising in cases pending in a Circuit Court of the United States and certified to the court for its decision, and then to be remanded to the Circuit Court. This is appellate jurisdiction, and is defined and limited by the single section of the act of April 29, 1802.
The case is not within the provisions of this section.
First. The question in the court below arose upon the application for a habeas corpus, before there was a service upon the parties having the petitioner in custody, before an answer was made by those parties, before the writ was ordered or issued, while yet there was no other party before the court, except the petitioner. The case was then an ex parte case, and is so still. The proceeding had not yet ripened into a "cause."
No division of opinion in such a case is within the purview of the section. The division of opinion on which this *11 court can act, must occur in the progress of a case where the parties on both sides are before the court, or have a status in the case. The right to send the question or point of division to this court can only arise upon the motion of the parties, or either of them,  not by the court on its own motion or for its own convenience. The record hardly exhibits the Attorney of the United States, Mr. Hanna, as taking any part.
The parties have an equal right to be heard upon the question in the court below. It must appear to them in open court that the judges are divided in opinion. They must have an equal right to move for its transfer to this court. They must have an equal opportunity to follow it here and to argue it here,  not as volunteers, not as amici curi, not by permission, but as parties on the record, with equal rights.
This record shows no parties, except the petitioner. Its title is Ex parte Milligan. The persons who are charged in the petition as having him in wrongful custody are not made parties, and had, when the question arose, no right to be heard as parties in the court below, and have no right to be heard as parties in this court.
In such a case, this court cannot answer any one of the questions sent here, especially the one, "Had the Military Commission jurisdiction to try and condemn Milligan?" For if the court answer that question in the negative, its answer is a final decision, and, as it is asserted, settles it for all the future of the case below; and when, hereafter, that case shall, in its progress, bring the parties complained of before the court, silences all argument upon the vital point so decided.[*] What becomes of the whole argument which will be made on the other side, of the right of every man before being condemned of crime, to be heard and tried by an impartial jury?
Second. This being an ex parte application for a writ of habeas corpus made to a court, the division of opinion then occurring was in effect a decision of the case.
*12 The case was ended when the court declined to issue the writ. It was not a division of opinion occurring in the progress of a case or the trial of a case, and when it was announced to the petitioner that one judge was in favor of granting the writ, and that the other would not grant it  that settled and ended the case. The case had not arisen within the meaning of the statute, when from necessity the case and the progress of the case must stop until the question should be decided. And as Milligan was sentenced to be hanged on the 19th May, for aught that appears, we are discussing a question relating to the liberty of a dead man. Having been sentenced to be hanged on the 19th, the presumption is that he was hanged on that day. Any answer to the questions raised will therefore be answers to moot points  answers which courts will not give.[*]
Third. If the parties had all been before the court below, and the case in progress, and then the questions certified, and the parties were now here, the court would not answer these questions.
1. Every question involves matters of fact not stated in an agreed case, or admitted on demurrer, but alleged by one of the parties, and standing alone on his ex parte statement.[]
2. All the facts bearing on the questions are not set forth, so that even if the parties had made an agreed state of facts, yet if this court find that other facts important to be known before a decision of the question do not appear, the questions will not be answered.[]
3. The main question certified, the one, as the counsel for the petitioners assert, on which the other two depend, had not yet arisen for decision, especially for final decision, so that if the parties had both concurred in sending that question here, this court could not decide it.
If it be said this question did arise upon the application for the writ, it did not then arise for final decision, but only as showing probable cause, leaving it open and undecided *13 until the answer should be made to the writ. A case, upon application for the writ of habeas corpus, has no status as a case until the service of the writ on the party having the petitioner in custody, and his return and the production of the body of the petitioner. No issue arises until there is a return, and when that is made the issue arises upon it, and in the courts of the United States it is conclusive as to the facts contained in the return.[*]
4. The uniform practice in this court is against its jurisdiction in such a case as this upon ex parte proceedings.
All the cases (some twenty in number) before this court, on certificates of division, during all the time that this jurisdiction has existed, are cases between parties, and stated in the usual formula of A. v. B., or B. ad sectam A.
So, too, all the rules of this court as to the rights and duties of parties in cases before this court, exclude the idea of an ex parte case under the head of appellate jurisdiction.
II. THE MERITS OR MAIN QUESTION.
Mr. Speed, A.G., and Mr. Butler: By the settled practice of the courts of the United States, upon application for a writ of habeas corpus, if it appear upon the facts stated by the petitioner, all of which shall be taken to be true, that he could not be discharged upon a return of the writ, then no writ will be issued. Therefore the questions resolve themselves into two:
I. Had the military commission jurisdiction to hear and determine the case submitted to it?
II. The jurisdiction failing, had the military authorities of the United States a right, at the time of filing the petition, to detain the petitioner in custody as a military prisoner, or for trial before a civil court?
1. A military commission derives its powers and authority wholly from martial law; and by that law and by military authority only are its proceedings to be judged or reviewed.[]
*14 2. Marital law is the will of the commanding officer of an armed force, or of a geographical military department, expressed in time of war within the limits of his military jurisdiction, as necessity demands and prudence dictates, restrained or enlarged by the orders of his military chief, or supreme executive ruler.[*]
3. Military law is the rules and regulations made by the legislative power of the State for the government of its land and naval forces.[]
4. The laws of war (when this expression is not used as a generic term) are the laws which govern the conduct of belligerents towards each other and other nations, flagranti bello.
These several kinds of laws should not be confounded, as their adjudications are referable to distinct and different tribunals.
Infractions of the laws of war can only be punished or remedied by retaliation, negotiation, or an appeal to the opinion of nations.
Offences against military laws are determined by tribunals established in the acts of the legislature which create these laws  such as courts martial and courts of inquiry.
The officer executing martial law is at the same time supreme legislator, supreme judge, and supreme executive. As necessity makes his will the law, he only can define and declare it; and whether or not it is infringed, and of the extent of the infraction, he alone can judge; and his sole order punishes or acquits the alleged offender.
But the necessities and effects of warlike operations which create the law also give power incidental to its execution. It would be impossible for the commanding general of an army to investigate each fact which might be supposed to interfere with his movements, endanger his safety, aid his enemy, or bring disorder and crime into the community under his charge. He, therefore, must commit to his officers, *15 and in practice, to a board of officers, as a tribunal, by whatever name it may be called, the charge of examining the circumstances and reporting the facts in each particular case, and of advising him as to its disposition  the whole matter to be then determined and executed by his order.[*]
Hence arise military commissions, to investigate and determine, not offences against military law by soldiers and sailors, not breaches of the common laws of war by belligerents, but the quality of the acts which are the proper subject of restraint by martial law.
Martial law and its tribunals have thus come to be recognized in the military operations of all civilized warfare. Washington, in the Revolutionary war, had repeated recourse to military commissions. General Scott resorted to them as instruments with which to govern the people of Mexico within his lines. They are familiarly recognized in express terms by the acts of Congress of July 17th, 1862, chap. 201, sec. 5; March 18th, 1863, chap. 75, sec. 36; Resolution No. 18, March 11th, 1862; and their jurisdiction over certain offences is also recognized by these acts.
But, as has been seen, military commissions do not thus derive their authority. Neither is their jurisdiction confined to the classes of offences therein enumerated.
Assuming the jurisdiction where military operations are being in fact carried on, over classes of military offences, Congress, by this legislation, from considerations of public safety, has endeavored to extend the sphere of that jurisdiction over certain offenders who were beyond what might be supposed to be the limit of actual military occupation.
As the war progressed, being a civil war, not unlikely, as the facts in this record abundantly show, to break out in any portion of the Union, in any form of insurrection, the President, as commander-in-chief, by his proclamation of September 24th, 1862, ordered:
"That during the existing insurrection, and as a necessary *16 means for suppressing the same, all rebels and insurgents, their aiders and abettors, within the United States, and all persons discouraging volunteer enlistments, resisting militia drafts, or guilty of any disloyal practice, affording aid and comfort to rebels, against the authority of the United States, shall be subject to martial law, and liable to trial and punishment by courts martial or military commission.
"Second. That the writ of habeas corpus is suspended in respect to all persons arrested, or who now, or hereafter during the Rebellion shall be, imprisoned in any fort, camp, arsenal, military prison, or other place of confinement, by any military authority, or by the sentence of any court martial or military commission."
This was an exercise of his sovereignty in carrying on war, which is vested by the Constitution in the President.[*]
This proclamation, which by its terms was to continue during the then existing insurrection, was in full force during the pendency of the proceedings complained of, at the time of the filing of this petition, and is still unrevoked.
While we do not admit that any legislation of Congress was needed to sustain this proclamation of the President, it being clearly within his power, as commander-in-chief, to issue it; yet, if it is asserted that legislative action is necessary to give validity to it, Congress has seen fit to expressly ratify the proclamation by the act of March 3d, 1863, by declaring that the President, whenever in his judgment the public safety may require it, is authorized to suspend the writ of habeas corpus in any case throughout the United States, and in any part thereof.
The offences for which the petitioner for the purpose of this hearing is confessed to be guilty, are the offences enumerated in this proclamation. The prison in which he is confined is a "military prison" therein mentioned. As to him, his acts and imprisonment, the writ of habeas corpus is expressly suspended.
Apparently admitting by his petition that a military commission *17 might have jurisdiction in certain cases, the petitioner seeks to except himself by alleging that he is a citizen of Indiana, and has never been in the naval or military service of the United States, or since the commencement of the Rebellion a resident of a rebel State, and that, therefore, it had been out of his power to have acquired belligerent rights and to have placed himself in such a relation to the government as to enable him to violate the laws of war.
But neither residence nor propinquity to the field of actual hostilities is the test to determine who is or who is not subject to martial law, even in a time of foreign war, and certainly not in a time of civil insurrection. The commander-in-chief has full power to make an effectual use of his forces. He must, therefore, have power to arrest and punish one who arms men to join the enemy in the field against him; one who holds correspondence with that enemy; one who is an officer of an armed force organized to oppose him; one who is preparing to seize arsenals and release prisoners of war taken in battle and confined within his military lines.
These crimes of the petitioner were committed within the State of Indiana, where his arrest, trial, and imprisonment took place; within a military district of a geographical military department, duly established by the commander-in-chief; within the military lines of the army, and upon the theatre of military operations; in a State which had been and was then threatened with invasion, having arsenals which the petitioner plotted to seize, and prisoners of war whom he plotted to liberate; where citizens were liable to be made soldiers, and were actually ordered into the ranks; and to prevent whose becoming soldiers the petitioner conspired with and armed others.
Thus far the discussion has proceeded without reference to the effect of the Constitution upon war-making powers, duties, and rights, save to that provision which makes the President commander-in-chief of the armies and navies.
Does the Constitution provide restraint upon the exercise of this power?
*18 The people of every sovereign State possess all the rights and powers of government. The people of these States in forming a "more perfect Union, to insure domestic tranquillity, and to provide for the common defence," have vested the power of making and carrying on war in the general government, reserving to the States, respectively, only the right to repel invasion and suppress insurrection "of such imminent danger as will not admit of delay." This right and power thus granted to the general government is in its nature entirely executive, and in the absence of constitutional limitations would be wholly lodged in the President, as chief executive officer and commander-in-chief of the armies and navies.
Lest this grant of power should be so broad as to tempt its exercise in initiating war, in order to reap the fruits of victory, and, therefore, be unsafe to be vested in a single branch of a republican government, the Constitution has delegated to Congress the power of originating war by declaration, when such declaration is necessary to the commencement of hostilities, and of provoking it by issuing letters of marque and reprisal; consequently, also, the power of raising and supporting armies, maintaining a navy, employing the militia, and of making rules for the government of all armed forces while in the service of the United States.
To keep out of the hands of the Executive the fruits of victory, Congress is also invested with the power to "make rules for the disposition of captures by land or water."
After war is originated, whether by declaration, invasion, or insurrection, the whole power of conducting it, as to manner, and as to all the means and appliances by which war is carried on by civilized nations, is given to the President. He is the sole judge of the exigencies, necessities, and duties of the occasion, their extent and duration.[*]
During the war his powers must be without limit, because, if defending, the means of offence may be nearly illimitable; *19 or, if acting offensively, his resources must be proportionate to the end in view,  "to conquer a peace." New difficulties are constantly arising, and new combinations are at once to be thwarted, which the slow movement of legislative action cannot meet.[*]
These propositions are axiomatic in the absence of all restraining legislation by Congress.
Much of the argument on the side of the petitioner will rest, perhaps, upon certain provisions  not in the Constitution itself, and as originally made, but now seen in the Amendments made in 1789: the fourth, fifth, and sixth amendments. They may as well be here set out:
4. The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue but upon probable cause supported by oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized.
5. No person shall be held to answer for a capital or otherwise infamous crime, unless on a presentment or indictment of a grand jury, except in cases arising in the land or naval forces, or in the militia when in actual service in time of war or public danger; nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use without just compensation.
6. In all criminal prosecutions the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, ... . and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the assistance of counsel for his defence.
In addition to these, there are two preceding amendments *20 which we may also mention, to wit: the second and third. They are thus:
2. A well-regulated militia being necessary to the security of a free State, the right of the people to keep and bear arms shall not be infringed.
3. No soldier shall in time of peace be quartered in any house without the consent of the owner, nor in time of war but in a manner to be prescribed by law.
It will be argued that the fourth, fifth, and sixth articles, as above given, are restraints upon the war-making power; but we deny this. All these amendments are in pari materiâ and if either is a restraint upon the President in carrying on war, in favor of the citizen, it is difficult to see why all of them are not. Yet will it be argued that the fifth article would be violated in "depriving of life, liberty, or property, without due process of law," armed rebels marching to attack the capital? Or that the fourth would be violated by searching and seizing the papers and houses of persons in open insurrection and war against the government? It cannot properly be so argued, any more than it could be that it was intended by the second article (declaring that "the right of the people to keep and bear arms shall not be infringed") to hinder the President from disarming insurrectionists, rebels, and traitors in arms while he was carrying on war against them.
These, in truth, are all peace provisions of the Constitution, and, like all other conventional and legislative laws and enactments, are silent amidst arms, and when the safety of the people becomes the supreme law.
By the Constitution, as originally adopted, no limitations were put upon the war-making and war-conducting powers of Congress and the President; and after discussion, and after the attention of the country was called to the subject, no other limitation by subsequent amendment has been made, except by the Third Article, which prescribes that "no soldier shall be quartered in any house in time of peace *21 without consent of the owner, or in time of war, except in a manner prescribed by law."
This, then, is the only expressed constitutional restraint upon the President as to the manner of carrying on war. There would seem to be no implied one; on the contrary, while carefully providing for the privilege of the writ of habeas corpus in time of peace, the Constitution takes it for granted that it will be suspended "in case of rebellion or invasion (i.e., in time of war), when the public safety requires it."
The second and third sections of the act relating to habeas corpus, of March 3d, 1863, apply only to those persons who are held as "state or political offenders," and not to those who are held as prisoners of war. The petitioner was as much a prisoner of war as if he had been taken in action with arms in his hands.
They apply, also, only to those persons, the cause of whose detention is not disclosed; and not to those who, at the time when the lists by the provisions of said sections are to be furnished to the court, are actually undergoing trial before military tribunals upon written charges made against them.
The law was framed to prevent imprisonment for an indefinite time without trial, not to interfere with the case of prisoners undergoing trial. Its purpose was to make it certain that such persons should be tried.
Notwithstanding, therefore, the act of March 3, 1863, the commission had jurisdiction, and properly tried the prisoner.
The petitioner does not complain that he has been kept in ignorance of the charges against him, or that the investigation of those charges has been unduly delayed.
Finally, if the military tribunal has no jurisdiction, the petitioner may be held as a prisoner of war, aiding with arms the enemies of the United States, and held, under the authority of the United States, until the war terminates, then to be handed over by the military to the civil authorities, to be tried for his crimes under the acts of Congress, and before the courts which he has selected.

*22 ON THE SIDE OF THE PETITIONER.
Mr. David Dudley Field:
Certain topics have been brought into this discussion which have no proper place in it, and which I shall endeavor to keep out of it.
This is not a question of the discipline of camps; it is not a question of the government of armies in the field; it is not a question respecting the power of a conqueror over conquered armies or conquered states.
It is not a question, how far the legislative department of the government can deal with the question of martial rule. Whatever has been done in these cases, has been done by the executive department alone.
Nor is it a question of the patriotism, or the character, or the services of the late chief magistrate, or of his constitutional advisers.
It is a question of the rights of the citizen in time of war.
Is it true, that the moment a declaration of war is made, the executive department of this government, without an act of Congress, becomes absolute master of our liberties and our lives? Are we, then, subject to martial rule, administered by the President upon his own sense of the exigency, with nobody to control him, and with every magistrate and every authority in the land subject to his will alone? These are the considerations which give to the case its greatest significance.
But we are met with the preliminary objection, that you cannot consider it for want of
JURISDICTION.
The objection is twofold: first, that the Circuit Court of Indiana had not jurisdiction to hear the case there presented; and, second, that this court has not jurisdiction to hear and decide the questions thus certified.
First. As to the jurisdiction of the Circuit Court. That depended on the fourteenth section of the Judiciary Act of *23 1789, and on the Habeas Corpus Act of 1863. The former was, in Bollman's case,[*] held to authorize the courts, as well as the judges, to issue the writ for the purpose of inquiring into the cause of commitment.
The act of March 3d, 1863, after providing that the Secretaries of State and of War shall furnish to the judges of the Circuit and District Courts a list of political and state prisoners, and of all others, except prisoners of war, goes on to declare, that if a grand jury has had a session, and has adjourned without finding an indictment, thereupon "it shall be the duty of the judge of said court forthwith to make an order, that any such prisoner desiring a discharge from said imprisonment be brought before him to be discharged."
Upon this act the objection is, first, that the application of the petitioner should have been made to one of the judges of the circuit, instead of the court itself; and, second, that the petition does not show whether it was made under the second or the third section.
To the former objection the answer is, first, that the decision in Bollman's case, just mentioned, covers this case; for the same reasoning which gives the court power to proceed under the fourteenth section of the act of 1789, gives the court power to proceed under the second and third sections of the act of 1863. The second answer is that, by the provisos of the second section, the court is expressly mentioned as having the power.
The other objection to the jurisdiction of the Circuit Court is, that the petition does not show under which section of the act it was presented. It states that the petitioner is held a prisoner under the authority of the President; that a term has been held, and that a grand jury has been in attendance, and has adjourned without indicting. It does not state whether a list has been furnished to the judges by the Secretary of State and the Secretary of War, and, therefore, argues the learned counsel, the court has no jurisdiction. That is to say, the judges, knowing themselves whether the *24 list has, or has not been furnished, cannot proceed, because we have not told them by our petition what they already know, and what we ourselves might not know, and perhaps could not know, because the law does not make it necessary that the list shall be filed, or that anybody shall be informed of it but the judges.
Second. As to the jurisdiction of this court. Supposing the Circuit Court to have had jurisdiction, has this court jurisdiction to hear these questions as they are certified? There are various objections. It is said that a division of opinion can be certified only in a cause, and that this is not a cause.
It was decided by this court, in Holmes v. Jennison,[*] that a proceeding on habeas corpus is a suit, and suit is a more comprehensive word than cause. The argument is, that it is not a cause until the adverse party comes in. Is not a suit commenced before the defendant is brought into court? Is the defendant's appearance the first proceeding in a cause? There have been three acts in respect to this writ of habeas corpus. The first of 1789; then the act passed in 1833; and, finally, the act of 1842. The last act expressly designates the proceeding as a cause.
Another objection is, that there must be parties; that is, at least two parties, and that here is only one. This argument is derived from the direction in the act, that the point must be stated "upon the request of either party" or their counsel. It is said that "either party" imports two, and if there are not two, there can be no certificate. This is too literal: "qui hret in litera hæet in cortice." The language is elliptical. What is meant is, "any party or parties, his or their counsel." Again: "either," if precisely used, would exclude all over two, because "either" strictly means "one of two;" and if there are three parties or more, as there may be, you cannot have a certificate. It is not unusual, in proceedings in rem, to have several intervenors and claimants: what are we to do then? The answer must be, that "either" is an equivalent word for "any;" and that whoever *25 may happen to be a party, whether he stand alone or with others, may ask for the certificate.
The words "either party" were introduced, not for restriction but enlargement. The purpose was to enable any party to bring the case here; otherwise it might have been argued, perhaps, that all parties must join in asking for the certificate. The purpose of the act was to prevent a failure of justice, when the two judges of the Circuit Court were divided in opinion. The reason of the rule is as applicable to a case with one party as if there were two. Whether a question shall be certified to this court, depends upon the point in controversy. If it concerns a matter of right, and not of discretion, there is as much reason for its being sent ex parte as for its being sent inter partes. This very case is an illustration. Here a writ is applied for, or an order is asked. The judges do not agree about the issue of the writ, or the granting of the order. Upon their action the lives of these men depend. Shall there be a failure of justice? The question presented to the Circuit Court was not merely a formal one; whether an initial writ should issue. It is the practice, upon petitions for habeas corpus, to consider whether, upon the facts presented, the prisoners, if brought up, would be remanded. The presentation of the petition brings before the court, at the outset, the merits, to a certain extent, of the whole case. That was the course pursued in Passmore Williamson's case;[*] in Rex v. Ennis;[] in the case of the Three Spanish Sailors;[] in Hobhouse's case;[§] in Husted's case;[] and in Ferguson's case;[¶] and in this court, in Watkins's case,[**] where the disposition of the case turned upon the point whether, if the writ were issued, the petitioner would be remanded upon the facts as they appeared.
There may, indeed, be cases where only one party can appear, that are at first and must always remain ex parte. *26 Here, however, there were, in fact, two parties. Who were they? The record tells us:
"Be it remembered, that on the 10th day of May, A.D. 1865, in the court aforesaid, before the judges aforesaid, comes Jonathan W. Gordon, Esq., of counsel for said Milligan, and files here in open court the petition of said Milligan to be discharged. At the same time comes, also, John Hanna, Esq., the attorney prosecuting the pleas of the United States in this behalf. And thereupon, by agreement, this application is submitted to the court, and day is given," &c.
The next day the case came on again, and the certificate was made.
In point of fact, therefore, this cause had all the solemnity which two parties could give it. The government came into court, and submitted the case in Indiana, for the very purpose of having it brought to Washington.
A still additional objection made to the jurisdiction of this court is, that no questions can be certified except those which arise upon the trial.
The answer is, first, that there has been a trial, in its proper sense, as applicable to this case. The facts are all before the court. A return could not vary them. The case has been heard upon the petition, as if that contained all that need be known, or could be known. The practice is not peculiar to habeas corpus; it is the same on application for mandamus, or for attachments in cases of contempt; in both which cases the court sometimes hears the whole matter on the first motion, and sometimes postpones it till formal pleadings are put in. In either case, the result is the same.
But, secondly, if it were not so, is it correct to say that a certificate can only be made upon a trial? To sustain this position, the counsel refers to the case of Davis v. Burden.[*] But that case expressly reserves the question.
It is admitted that the question of jurisdiction is a question that may be certified. The qualification insisted upon is, *27 that no question can be certified unless it arose upon the trial of the cause, or be a question of jurisdiction. This is a question of jurisdiction. It is a question of the jurisdiction of the Circuit Court to grant the writ of habeas corpus, and to liberate these men; and that question brings up all the other questions in the cause.
Yet another objection to the jurisdiction of this court is, that the case must be one in which the answer to the questions when given shall be final; that is to say, the questions come here to be finally decided. What does that mean? Does it mean that the same thing can never be debated again? Certainly not. It means that the decision shall be final for the two judges who certified the difference of opinion, so that when the answer goes down from this court they shall act according to its order, as if they had originally decided in the same way.
Another objection to the jurisdiction of this court is, that the whole case is certified. The answer is, that no question is certified except those which actually arose before the court at the time, and without considering which it could not move at all. That is the first answer. The second is, that if too much is certified, the court will divide the questions, and answer only those which it finds to be properly certified, as it did in the Silliman v. Hudson River Bridge Company[*] case.
The last objection to the jurisdiction of this court is, that the case is ended; because, it is to be presumed that these unfortunate men have been hanged. Is it to be presumed that any executive officer of this country, though he arrogate to himself this awful power of military government, would venture to put to death three men, who claim that they are unjustly convicted, and whose case is considered of such gravity by the Circuit Court of the United States that it certifies the question to the Supreme Court?
The suggestion is disrespectful to the executive, and I am glad to believe that it has no foundation in fact.
*28 All the objections, then, are answered. There is nothing, then, in the way of proceeding to
II. THE MERITS AND MAIN QUESTION.
The argument upon the questions naturally divides itself into two parts:
First. Was the military commission a competent tribunal for the trial of the petitioners upon the charges upon which they were convicted and sentenced?
Second. If it was not a competent tribunal, could the petitioners be released by the Circuit Court of the United States for the District of Indiana, upon writs of habeas corpus or otherwise?
The discussion of the competency of the military commission is first in order, because, if the petitioners were lawfully tried and convicted, it is useless to inquire how they could be released from an unlawful imprisonment.
If, on the other hand, the tribunal was incompetent, and the conviction and sentence nullities, then the means of relief become subjects of inquiry, and involve the following considerations:
1. Does the power of suspending the privilege of the writ of habeas corpus appertain to all the great departments of government concurrently, or to some only, and which of them?
2. If the power is concurrent, can its exercise by the executive or judicial department be restrained or regulated by act of Congress?
3. If the power appertains to Congress alone, or if Congress may control its exercise by the other departments, has that body so exercised its functions as to leave to the petitioners the privilege of the writ, or to entitle them to their discharge?
In considering the first question, that of the competency of the military tribunal for the trial of the petitioners upon those charges, let me first call attention to the dates of the transactions.
Let it be observed next, that for the same offences as those *29 set forth in the charges and specifications, the petitioners could have been tried and punished by the ordinary civil tribunals.
Let it also be remembered, that Indiana, at the time of this trial, was a peaceful State; the courts were all open; their processes had not been interrupted; the laws had their full sway.
Then let it be remembered that the petitioners were simple citizens, not belonging to the army or navy; not in any official position; not connected in any manner with the public service.
The evidence against them is not to be found in this record, and it is immaterial. Their guilt or their innocence does not affect the question of the competency of the tribunal by which they were judged.
Bearing in mind, therefore, the nature of the charges, and the time of the trial and sentence; bearing in mind, also, the presence and undisputed authority of the civil tribunals and the civil condition of the petitioners, we ask by what authority they were withdrawn from their natural judges?
What is a military commission? Originally, it appears to have been an advisory board of officers, convened for the purpose of informing the conscience of the commanding officer, in cases where he might act for himself if he chose. General Scott resorted to it in Mexico for his assistance in governing conquered places. The first mention of it in an act of Congress appears to have been in the act of July 22, 1861, where the general commanding a separate department, or a detached army, was authorized to appoint a military board, or commission, of not less than three, or more than five officers, to examine the qualifications and conduct of commissioned officers of volunteers.
Subsequently, military commissions are mentioned in four acts of Congress, but in none of them is any provision made for their organization, regulation, or jurisdiction, further than that it is declared that in time of war or rebellion, spies may be tried by a general court-martial or military commission; and that "persons who are in the military service of *30 the United States, and subject to the Articles of War," may also be tried by the same, for murder, and certain other infamous crimes.
These acts do not confer upon military commissions jurisdiction over any persons other than those in the military service and spies.
There being, then, no act of Congress for the establishment of the commission, it depended entirely upon the executive will for its creation and support. This brings up the true question now before the court: Has the President, in time of war, upon his own mere will and judgment, the power to bring before his military officers any person in the land, and subject him to trial and punishment, even to death? The proposition is stated in this form, because it really amounts to this.
If the President has this awful power, whence does he derive it? He can exercise no authority whatever but that which the Constitution of the country gives him. Our system knows no authority beyond or above the law. We may, therefore, dismiss from our minds every thought of the President's having any prerogative, as representative of the people, or as interpreter of the popular will. He is elected by the people to perform those functions, and those only, which the Constitution of his country, and the laws made pursuant to that Constitution, confer.
The plan of argument which I propose is, first to examine the text of the Constitution. That instrument, framed with the greatest deliberation, after thirteen years' experience of war and peace, should be accepted as the authentic and final expression of the public judgment, regarding that form and scope of government, and those guarantees of private rights, which legal science, political philosophy, and the experience of previous times had taught as the safest and most perfect. All attempts to explain it away, or to evade or pervert it, should be discountenanced and resisted. Beyond the line of such an argument, everything else ought, in strictness, to be superfluous. But, I shall endeavor to show, further, that the theory of our government, for which I am contending, *31 is the only one compatible with civil liberty; and, by what I may call an historical argument, that this theory is as old as the nation, and that even in the constitutional monarchies of England and France that notion of executive power, which would uphold military commissions, like the one against which I am speaking, has never been admitted.
What are the powers and attributes of the presidential office? They are written in the second article of the Constitution, and, so far as they relate to the present question, they are these: He is vested with the "executive power;" he is "commander-in-chief of the army and navy of the United States, and of the militia of the several States when called into the actual service of the United States;" he is to "take care that the laws be faithfully executed;" and he takes this oath: "I do solemnly swear that I will faithfully execute the office of President of the United States, and will, to the best of my ability, preserve, protect, and defend the Constitution of the United States." The "executive power" mentioned in the Constitution is the executive power of the United States. The President is not clothed with the executive power of the States. He is not clothed with any executive power, except as he is specifically directed by some other part of the Constitution, or by an act of Congress.
He is to "take care that the laws be faithfully executed." He is to execute the laws by the means and in the manner which the laws themselves prescribe.
The oath of office cannot be considered as a grant of power. Its effect is merely to superadd a religious sanction to what would otherwise be his official duty, and to bind his conscience against any attempt to usurp power or overthrow the Constitution.
There remains, then, but a single clause to discuss, and that is the one which makes him commander-in-chief of the army and navy of the United States, and of the militia of the States when called into the federal service. The question, therefore, is narrowed down to this: Does the authority to command an army carry with it authority to arrest and *32 try by court-martial civilians  by which I mean persons not in the martial forces; not impressed by law with a martial character? The question is easily answered. To command an army, whether in camp, or on the march, or in battle, requires the control of no other persons than the officers, soldiers, and camp followers. It can hardly be contended that, if Congress neglects to find subsistence, the commander-in-chief may lawfully take it from our own citizens. It cannot be supposed that, if Congress fails to provide the means of recruiting, the commander-in-chief may lawfully force the citizens into the ranks. What is called the war power of the President, if indeed there be any such thing, is nothing more than the power of commanding the armies and fleets which Congress causes to be raised. To command them is to direct their operations.
Much confusion of ideas has been produced by mistaking executive power for kingly power. Because in monarchial countries the kingly office includes the executive, it seems to have been sometimes inferred that, conversely, the executive carries with it the kingly prerogative. Our executive is in no sense a king, even for four years.
So much for that article of the Constitution, the second, which creates and regulates the executive power. If we turn to the other portions of the original instrument (I do not now speak of the amendments) the conclusion already drawn from the second article will be confirmed, if there be room for confirmation. Thus, in the first article, Congress is authorized "to declare war, and make rules concerning captures on land and water;" "to raise and support armies;" "to provide and maintain a navy;" "to make rules for the government and regulation of the land and naval forces;" "to provide for calling forth the militia to execute the laws of the Union, suppress insurrections, and repel invasions;" "to provide for organizing, arming, and disciplining the militia, and governing such part of them as may be in the service of the United States, reserving to the States respectively the appointment of the officers, and the authority of training the militia according to the discipline prescribed *33 by Congress;" "to exercise exclusive legislation in all cases whatsoever over ... . all places purchased ... . for the erection of forts, magazines, arsenals, dock-yards;" "to make all laws which shall be necessary and proper for carrying into execution the ... . powers vested by this Constitution in the Government of the United States, or in any department or officer thereof."
These various provisions of the first article would show, if there were any doubt upon the construction of the second, that the powers of the President do not include the power to raise or support an army, or to provide or maintain a navy, or to call forth the militia, to repel an invasion, or to suppress an insurrection, or execute the laws, or even to govern such portions of the militia as are called into the service of the United States, or to make law for any of the forts, magazines, arsenals, or dock-yards. If the President could not, even in flagrant war, except as authorized by Congress, call forth the militia of Indiana to repel an invasion of that State, or, when called, govern them, it is absurd to say that he could nevertheless, under the same circumstances, govern the whole State and every person in it by martial rule.
The jealousy of the executive power prevailed with our forefathers. They carried it so far that, in providing for the protection of a State against domestic violence, they required, as a condition, that the legislature of the State should ask for it if possible to be convened.[*]
I submit, therefore, that upon the text of the original Constitution, as it stood when it was ratified, there is no color for the assumption that the President, without act of Congress, could create military commissions for the trial of persons not military, for any cause or under any circumstances whatever.
But, as we well know, the Constitution, in the process of ratification, had to undergo a severe ordeal. To quiet apprehensions, as well as to guard against possible dangers, ten amendments were proposed by the first Congress sitting at *34 New York, in 1789, and were duly ratified by the States. The third and fifth are as follows:
"ART. III. No soldier shall, in time of peace, be quartered in any house, without the consent of the owner, nor in time of war, but in a manner to be prescribed by law."
"ART. V. No person shall be held to answer for a capital or otherwise infamous crime, unless on a presentment or indictment of a grand jury, except in cases arising in the land or naval forces, or in the militia when in actual service, in time of war or public danger; nor shall any person be subject, for the same offence, to be twice put in jeopardy of life or limb, nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law, nor shall private property be taken for public use without just compensation."
If there could have been any doubt whatever, whether military commissions or courts-martial for the trial of persons not "in the land or naval forces, or the militia" in actual service, could ever be established by the President, or even by Congress, these amendments would have removed the doubt. They were made for a state of war as well as a state of peace; they were aimed at the military authority, as well as the civil; and they were as explicit as our mother tongue could make them.
The phrase "in time of war or public danger" qualifies the member of the sentence relating to the militia; as otherwise, there could be no court-martial in the army or navy during peace.
This is the argument upon the text of the Constitution.
I will now show that military tribunals for civilians, or non-military persons, whether in war or peace, are inconsistent with the liberty of the citizen, and can have no place in constitutional government. This is a legitimate argument even upon a question of interpretation; for if there be, as I think there is not, room left for interpretation of what seem to be the plain provisions of the Constitution, then the principles of liberty, as they were understood by the fathers of the Republic; the maxims of free government, as they were *35 accepted by the men who framed and those who adopted the Constitution; and those occurrences in the history of older states, which they had profoundly studied, may be called in to show us what they must have meant by the words they used.
The source and origin of the power to establish military commissions, if it exist at all, is in the assumed power to declare what is called martial law. I say what is called martial law, for strictly there is no such thing as martial law; it is martial rule; that is to say, the will of the commanding officer, and nothing more, nothing less.
On this subject, as on many others, the incorrect use of a word has led to great confusion of ideas and to great abuses. People imagine, when they hear the expression martial law, that there is a system of law known by that name, which can upon occasion be substituted for the ordinary system; and there is a prevalent notion that under certain circumstances a military commander may, by issuing a proclamation, displace one system, the civil law, and substitute another, the martial. A moment's reflection will show that this is an error. Law is a rule of property and of conduct, prescribed by the sovereign power of the state. The Civil Code of Louisiana defines it as "a solemn expression of legislative will." Blackstone calls it "a rule of civil conduct prescribed by the supreme power in the state;" ... "not a transient, sudden order from a superior to or concerning a particular person, but something permanent, uniform, and universal." Demosthenes thus explains it: "The design and object of laws is to ascertain what is just, honorable, and expedient; and when that is discovered, it is proclaimed as a general ordinance, equal and impartial to all."
There is a system of regulations known as the Rules and Articles of War, prescribed by Congress for the government of the army and navy, under that clause of the Constitution which empowers Congress "to make rules for the government and regulation of the land and naval forces." This is generally known as military law.[*]
*36 There are also certain usages, sanctioned by time, for the conduct towards each other of nations engaged in war, known as the usages of war, or the jus belli, accepted as part of the law of nations, and extended from national to all belligerents. These respect, however, only the conduct of belligerents towards each other, and have no application to the present case.
What is ordinarily called martial law is no law at all. Wellington, in one of his despatches from Portugal, in 1810, in his speech on the Ceylon affair, so describes it.
Let us call the thing by its right name; it is not martial law, but martial rule. And when we speak of it, let us speak of it as abolishing all law, and substituting the will of the military commander, and we shall give a true idea of the thing, and be able to reason about it with a clear sense of what we are doing.
Another expression, much used in relation to the same subject, has led also to misapprehension; that is, the declaration, or proclamation, of martial rule; as if a formal promulgation made any difference. It makes no difference whatever.
It may be asked, may a general never in any case use force but to compel submission in the opposite army and obedience in his own? I answer, yes; there are cases in which he may. There is a maxim of our law which gives the reason and the extent of the power: "Necessitas quod cogit defendit." This is a maxim not peculiar in its application to military men; it applies to all men under certain circumstances.
Private persons may lawfully tear down a house, if necessary, to prevent to spread of a fire. Indeed, the maxim is not confined in its application to the calamities of war and conflagration. A mutiny, breaking out in a garrison, may make necessary for its suppression, and therefore justify, acts which would otherwise be unjustifiable. In all these cases, however, the person acting under the pressure of necessity, real or supposed, acts at his peril. The correctness of his conclusion must be judged by courts and juries, *37 whenever the acts and the alleged necessity are drawn in question.
The creation of a commission or board to decide or advise upon the subject gives no increased sanction to the act. As necessity compels, so that necessity alone can justify it. The decision or advice of any number of persons, whether designated as a military commission, or board of officers, or council of war, or as a committee, proves nothing but greater deliberation; it does not make legal what would otherwise be illegal.
Let us proceed now to the historical part of the argument.
First. As to our own country. The nation began its life in 1776, with a protest against military usurpation. It was one of the grievances set forth in the Declaration of Independence, that the king of Great Britain had "affected to render the military independent of and superior to the civil power." The attempts of General Gage, in Boston, and of Lord Dunmore, in Virginia, to enforce martial rule, excited the greatest indignation. Our fathers never forgot their principles; and though the war by which they maintained their independence was a revolutionary one, though their lives depended on their success in arms, they always asserted and enforced the subordination of the military to the civil arm.
The first constitutions of the States were framed with the most jealous care. By the constitution of New Hampshire, it was declared that "in all cases, and at all times, the military ought to be under strict subordination to, and governed by the civil power;" by the constitution of Massachusetts of 1780, that "no person can in any case be subjected to law martial, or to any penalties or pains by virtue of that law, except those employed in the army or navy, and except the militia in actual service, but by the authority of the legislature;" by the constitution of Pennsylvania of 1776, "that the military should be kept under strict subordination to, and governed by the civil power;" by the constitution of Delaware of 1776, "that in all cases, and at all times, the *38 military ought to be under strict subordination to, and governed by the civil power;" by that of Maryland of 1776, "that in all cases, and at all times, the military ought to be under strict subordination to, and control of the civil power;" by that of North Carolina, 1776, "that the military should be kept under strict subordination to, and governed by the civil power;" by that of South Carolina, 1778, "that the military be subordinate to the civil power of the State;" and by that of Georgia, 1777, that "the principles of the habeas corpus act shall be part of this constitution; and freedom of the press, and trial by jury, to remain inviolate forever."
Second. As to England, the constitutional history of that country is the history of a struggle on the part of the crown to obtain or to exercise a similar power to the one here attempted to be set up. The power was claimed by the king as much in virtue of his royal prerogative and of his feudal relations to his people as lord paramount, as of his title as commander of the forces. But it is enough to say that, from the day when the answer of the sovereign was given in assent to the petition of right, courts-martial for the trial of civilians, upon the authority of the crown alone, have always been held illegal.
Third. As to France  as France was when she had a constitutional government. I have shown what the king of England cannot do. Let me show what the constitutional king of France could not do.
On the continent of Europe, the legal formula for putting a place under martial rule is to declare it in a state of siege; as if there were in the minds of lawyers everywhere no justification for such a measure but the exigencies of impending battle. The charter established for the government of France, on the final expulsion of the first Napoleon, contained these provisions:
"ART. The king is the supreme chief of the state; he commands the forces by sea and land; declares war; makes treaties of peace, alliance, and commerce; appoints to every office and agency of public administration; and makes rules and ordinances *39 necessary for the execution of the laws, without the power ever of suspending them, or dispensing with their execution."
"ART. The king alone sanctions and promulgates the laws."
"ART. No person can be withdrawn from his natural judges."
"ART. Therefore there cannot be erected commissions or extraordinary tribunals."
When Charles the Tenth was driven from the kingdom the last article was amended, by adding the words, "under what name or denomination soever;" Dupin giving the reason thus:
"In order to prevent every possible abuse, we have added to the former text of the charter `under what name or denomination soever,' for specious names have never been wanting for bad things, and without this precaution the title of `ordinary tribunal' might be conferred on the most irregular and extraordinary of courts."
Now, it so happened, that two years later, the strength of these constitutional provisions was to be tested. A formidable insurrection broke out in France. The king issued an order, dated June 6, 1832, placing Paris in a state of siege, founded "on the necessity of suppressing seditious assemblages which had appeared in arms in the capital, during the days of June 5th and 6th; on attacks upon public and private property; on assassinations of national guards, troops of the line, municipal guards and officers in the public service; and on the necessity of prompt and energetic measures to protect public safety against the renewal of similar attacks." On the 18th of June, one Geoffroy, designer, of Paris, was, by a decision of the second military commission of Paris, declared "guilty of an attack, with intent to subvert the government and to excite civil war," and condemned to death.
He appealed to the Court of Cassation. Odilon Barrot, a leader of the French bar, undertook his case, and after a discussion memorable forever for the spirit and learning of the advocates, and the dignity and independence of the judges, the court gave judgment, thus:
*40 "Whereas Geoffroy, brought before the second military commission of the first military division, is neither in the army nor impressed with a military character, yet nevertheless said tribunal has implicitly declared itself to have jurisdiction and passed upon the merits, wherein it has committed an excess of power, violated the limits of its jurisdiction, and the provisions of articles 53 and 54 of the charter and those of the laws above cited: On these grounds the court reverses and annuls the proceedings instituted against the appellant before the said commission, whatsoever has followed therefrom, and especially the judgment of condemnation of the 18th of June, instant; and in order that further proceedings be had according to law, remands him before one of the judges of instruction of the court of first instance of Paris," &c.
Thereupon the prisoner was discharged from military custody.
This closes my argument against the competency of the military commission.
It remains to consider what remedy, if any, there was against this unlawful judgment and its threatened execution.
The great remedy provided by our legal and political system for unlawful restraint, whether upon pretended judgments, decrees, sentences, warrants, orders, or otherwise, is the writ of habeas corpus.
The authority to suspend the privilege of the habeas corpus is derived, it is said, from two sources: first, from the martial power; and, second, from the second subdivision of the ninth section of the first article of the Federal Constitution.
As to the martial power, I have already discussed it so fully that I need not discuss it again.
How, then, stands the question upon the text of the Constitution? This is the language: "The privilege of the writ of habeas corpus shall not be suspended, unless when, in cases of rebellion or invasion, the public safety may require it."
The clause in question certainly either grants the power, or implies that it is already granted; and in either case it *41 belongs to the legislative, executive, and judicial departments concurrently, or to some excluding the rest.
There have been four theories: one that it belongs to all the departments; a second, that it belongs to the legislature; a third, that it belongs to the executive; and the fourth, that it belongs to the judiciary.
Is the clause a grant or a limitation of power? Looking only at the form of expression, it should be regarded as a limitation.
As a grant of power, it would be superfluous, for it is clearly an incident of others which are granted.
Then, regarding the clause according to its place in the Constitution, it should be deemed a limitation; for it is placed with six other subdivisions in the same section, every one of which is a limitation.
If the sentence respecting the habeas corpus be, as I contend, a limitation, and not a grant of power, we must look into other parts of the Constitution to find the grant; and if we find none making it to the President, it follows that the power is in the legislative or the judicial department. That it lies with the judiciary will hardly be contended. That department has no other function than to judge. It cannot refuse or delay justice.
But if the clause in question were deemed a grant of power, the question would then be, to whom is the grant made? The following considerations would show that it was made to Congress:
First. The debates in the convention which framed the Constitution seem, at least, to suppose that the power was given to Congress, and to Congress alone.
Second. The debates in the various State conventions which ratified the Constitution do most certainly proceed upon that supposition.
Third. The place in which the provision is left indicates, if it does not absolutely decide, that it relates only to the powers of Congress. It is not in the second article, which treats of the executive department. It is not in the third, which treats of the judicial department. It is in the first *42 article, which treats of the legislative department. There is not another subdivision in all the seven subdivisions of the ninth section which does not relate to Congress in part, at least, and most of them relate to Congress alone.
Fourth. The constitutional law of the mother country had been long settled, that the power of suspending the privilege of the writ, or, as it was sometimes called, suspending the writ itself, belonged only to Parliament. With this principle firmly seated in the minds of lawyers, it seems incredible that so vast a change as conferring the grant upon the executive should have been so loosely and carelessly expressed.
Fifth. The prevailing sentiment of the time when the Constitution was framed, was a dislike and dread of executive authority. It is hardly to be believed, that so vast and dangerous a power would have been conferred upon the President, without providing some safeguards against its abuse.
Sixth. Every judicial opinion, and every commentary on the Constitution, up to the period of the Rebellion, treated the power as belonging to Congress, and to that department only.
And so we submit to the court, that the answers to the three questions, certified by the court below, should be, to the first, that, on the facts stated in the petition and exhibits, a writ of habeas corpus ought to be issued according to the prayer of the petition; to the second, that, on the same facts, the petitioner ought to be discharged; and to the third, that the military commission had not jurisdiction to try and sentence the petitioner, in manner and form as in the petition and exhibits is stated.
Mr. Garfield, on the same side.
Had the military commission jurisdiction legally to try and sentence the petitioner? This is the main question.
The Constitution establishes the Supreme Court, and empowers Congress 
"To constitute tribunals inferior to the Supreme Court."
"To make rules for the government of the land and naval *43 forces, and to provide for governing such part of the militia as may be employed in the service of the United States."
For all cases not arising in the land or naval forces, Congress has provided in the Judiciary Act of September 24th, 1789, and the acts amendatory thereof. For all cases arising in the naval forces, it has fully provided in the act of March 2d, 1799, "for the government of the navy of the United States," and similar subsequent acts.
We are apt to regard the military department of the government as an organized despotism, in which all personal rights are merged in the will of the commander-in-chief. But that department has definitely marked boundaries, and all its members are not only controlled, but also sacredly protected by definitely prescribed law. The first law of the Revolutionary Congress, passed September 20th, 1776, touching the organization of the army, provided that no officer or soldier should be kept in arrest more than eight days without being furnished with the written charges and specifications against him; that be should be tried, at as early a day as possible, by a regular military court, whose proceedings were regulated by law, and that no sentence should be carried into execution till the full record of the trial had been submitted to Congress or to the commander-in-chief, and his or their direction be signified thereon. From year to year Congress has added new safeguards to protect the rights of its soldiers, and the rules and articles of war are as really a part of the laws of the land as the Judiciary Act or the act establishing the treasury department. The main boundary line between the civil and military jurisdictions is the muster into service. In Mills v. Martin,[*] a militiaman, called out by the Governor of the State of New York, and ordered by him to enter the service of the United States, on a requisition of the President for troops, refused to obey the summons, and was tried by a Federal court-martial for disobedience of orders. The Supreme Court of the State of New York decided, that until he had gone to the place of *44 general rendezvous, and had been regularly enrolled, and mustered into the national militia, he was not amenable to the action of a court-martial composed of officers of the United States.[*]
By the sixtieth article of war, the military jurisdiction is so extended as to cover those persons not mustered into the service, but necessarily connected with the army. It provides that:
"All sutlers and retainers to the camp, and all persons whatsoever, serving with the armies of the United States in the field, though not enlisted soldiers, are to be subject to orders according to the rules and articles of war."
That the question of jurisdiction might not be doubtful, it was thought necessary to provide by law of Congress that spies should be subject to trial by court-martial. As the law stood for eighty-five years, spies were described as "persons not citizens of, or owing allegiance to, the United States, who shall be found lurking," &c. Not until after the Great Rebellion began, was this law so amended as to allow the punishment by court-martial of citizens of the United States who should be found lurking about the lines of our army to betray it to the enemy.
It is evident, therefore, that by no loose and general construction of the law can citizens be held amenable to military tribunals, whose jurisdiction extends only to persons mustered into the military service, and such other classes of persons as are, by express provisions of law, made subject to the rules and articles of war. But even within their proper jurisdiction, military courts are, in many important particulars, subordinate to the civil courts. This is acknowledged by the leading authorities on the subject,[] and also by precedents, to some of which I refer:
1. A Lieutenant Frye, serving in the West Indies, in 1743, on a British man-of-war, was ordered by his superior *45 officer to assist in arresting another officer. The lieutenant demanded, what he had, according to the customs of the naval service, a right to demand, a written order before he would obey the command. For this he was put under arrest, tried by a naval court-martial, and sentenced to fifteen years' imprisonment. In 1746 he brought an action before a civil court against the president of the court-martial, and damages of £1000 were awarded him for his illegal detention and sentence; and the judge informed him that he might also bring his action against any member of the court-martial. Rear Admiral Mayne and Captain Rentone, who were members of the court that tried him, were at the time, when damages were awarded to Lieutenant Frye, sitting on a naval court-martial. The lieutenant proceeded against them, and they were arrested by a writ from the Common Pleas. The order of arrest was served upon them one afternoon, just as the court-martial adjourned. Its members, fifteen in number, immediately reassembled and passed resolutions declaring it a great insult to the dignity of the naval service that any person, however high in civil authority, should order the arrest of a naval officer for any of his official acts. Lord Chief Justice Willes immediately ordered the arrest of all the members of the court who signed the resolutions, and they were arrested. They appealed to the king, who was very indignant at the arrest. The judge, however, persevered in his determination to maintain the supremacy of civil law, and after two months' examination and investigation of the cause, all the members of the court-martial signed an humble and submissive letter of apology, begging leave to withdraw their resolutions, in order to put an end to further proceedings. When the Lord Chief Justice had heard the letter read in open court, he directed that it be recorded in the Remembrance Office, "to the end," as he said, "that the present and future ages may know that whosoever set themselves up in opposition to the law, or think themselves above the law, will in the end find themselves mistaken."[*]
*46 2. In Wilson v. McKenzie[*] it was proved that a mutiny of very threatening aspect had broken out; and that the lives of the captain and his officers were threatened by the mutineers. Among the persons arrested was the plaintiff, Wilson, an enlisted sailor, who being supposed to be in the conspiracy, was knocked down by the captain, ironed, and held in confinement for a number of days. When the cruise was ended, Wilson brought suit against the captain for illegal arrest and imprisonment. The cause was tried before the Supreme Court of New York; Chief Justice Nelson delivered the judgment of the court, giving judgment in favor of Wilson.
A clear and complete statement of the relation between civil and military courts may be found in Dynes v. Hoover,[] in this court:
"If a court-martial has no jurisdiction over the subject-matter of the charge it has been convened to try, or shall inflict a punishment forbidden by the law, though its sentence shall be approved by the officers having a revisory power of it, civil courts may, on an action by a party aggrieved by it, inquire into the want of the court's jurisdiction and give him redress."
"The courts of common law will examine whether courts-martial have exceeded the jurisdiction given them, though it is said, `not, however, after the sentence has been ratified and carried into execution.'"
It is clear, then, that the Supreme Court of the United States may inquire into the question of jurisdiction of a military court; may take cognizance of extraordinary punishment inflicted by such a court not warranted by law; and may issue writs of prohibition or give such other redress as the case may require. It is also clear that the Constitution and laws of the United States have carefully provided for the protection of individual liberty and the right of accused persons to a speedy trial before a tribunal established and regulated by law.
*47 To maintain the legality of the sentence here, opposite counsel are compelled not only to ignore the Constitution, but to declare it suspended  its voice lost in war  to hold that from the 5th of October, 1864, to the 9th of May, 1865, martial law alone existed in Indiana; that it silenced not only the civil courts, but all the laws of the land, and even the Constitution itself; and that during this silence the executor of martial law could lay his hand upon every citizen; could not only suspend the writ of habeas corpus, but could create a court which should have the exclusive jurisdiction over the citizen to try him, sentence him, and put him to death.
Sir Matthew Hale, in his History of the Common Law,[*] says:
"Touching the business of martial law, these things are to be observed, viz.:
"First. That in truth and reality it is not a law, but something indulged rather than allowed as a law; the necessity of government, order, and discipline in an army, is that only which can give those laws a countenance: quod enim necessitas cogit defendit.
"Secondly. This indulged law was only to extend to members of the army, or to those of the opposed army, and never was so much indulged as intended to be executed or exercised upon others, for others who had not listed under the army had no color or reason to be bound by military constitutions applicable only to the army, whereof they were not parts, but they were to be ordered and governed according to the laws to which they were subject, though it were a time of war.
"Thirdly. That the exercises of martial law, whereby any person should lose his life, or member, or liberty, may not be permitted in time of peace, when the king's courts are open for all persons to receive justice according to the laws of the land. This is declared in the Petition of Right (3 Car. I), whereby such commissions and martial law were repealed and declared to be contrary to law."
*48 In order to trace the history and exhibit the character of martial law, reference may be made to several leading precedents in English and American history.
1. The Earl of Lancaster. In the year 1322, the Earl of Lancaster and the Earl of Hereford rebelled against the authority of Edward II. They collected an army so large that Edward was compelled to raise forty thousand men to withstand them. The rebellious earls posted their forces on the Trent, and the armies of the king confronted them. They fought at Boroughbridge; the insurgent forces were overthrown; Hereford was slain and Lancaster taken in arms at the head of his army, and amid the noise of battle was tried by a court-martial, sentenced to death, and executed. When Edward III came into power, eight years later, on a formal petition presented to Parliament by Lancaster's son, setting forth the facts, the case was examined and a law was enacted reversing the attainder, and declaring: "1. That in time of peace no man ought to be adjudged to death for treason or any other offence without being arraigned and held to answer. 2. That regularly when the king's courts are open it is a time of peace in judgment of law; and 3. That no man ought to be sentenced to death, by the record of the king, without his legal trial per pares."[*]
So carefully was the line drawn between civil and martial law five hundred years ago.
2. Sir Thomas Darnell. He was arrested in 1625 by order of the king, for refusing to pay a tax which he regarded as illegal. He was arrested and imprisoned. A writ of habeas corpus was prayed for, but answer was returned by the court that he had been arrested by special order of the king, and that was held to be a sufficient answer to the petition. Then the great cause came up to be tried in Parliament, whether the order of the king was sufficient to override the writ of habeas corpus, and after a long and stormy debate, in which the ablest minds in England were engaged, the Petition of Right, of 1628, received the sanction of the king. In that *49 statute it was decreed that the king should never again suspend the writ of habeas corpus; that he should never again try a subject by military commission; and since that day no king of England has presumed to usurp that high prerogative, which belongs to Parliament alone.
3. The Bill of Rights of 1688. The house of Stuart had been expelled and William had succeeded to the British throne. Great disturbances had arisen in the realm in consequence of the change of dynasty. The king's person was unsafe in London. He informed the Lords and Commons of the great dangers that threatened the kingdom, and reminded them that he had no right to declare martial law, to suspend the writ of habeas corpus, or to seize and imprison his subjects on suspicion of treason or intended outbreak against the peace of the realm. He laid the case before them and asked their advice and assistance. In answer, Parliament passed the celebrated habeas corpus act. Since that day, no king of England has dared to suspend the writ. It is only done by Parliament.
4. Governor Wall. In the year 1782, Joseph Wall, governor of the British colony at Goree, in Africa, had under his command about five hundred British soldiers. Suspecting a mutiny about to break out in the garrison, he assembled them on the parade-ground, held a hasty consultation with his officers, and immediately ordered Benjamin Armstrong, a private, and supposed ringleader, to be seized, stripped, tied to the wheel of an artillery-carriage, and with a rope one inch in diameter, to receive eight hundred lashes. The order was carried into execution, and Armstrong died of his injuries. Twenty years afterward Governor Wall was brought before the most august civil tribunal of England to answer for the murder of Armstrong. Sir Archibald McDonald, Lord Chief Baron of the Court of Exchequer, Sir Soulden Lawrence, of the King's Bench, Sir Giles Rooke, of the Common Pleas, constituted the court. Wall's counsel claimed that he had the power of life and death in his hands in time of mutiny; that the necessity of the case authorized him to suspend the usual forms of law; that as governor *50 and military commander-in-chief of the forces at Goree, he was the sole judge of the necessities of the case. After a patient hearing before that high court, he was found guilty of murder, was sentenced and executed.[*]
I now ask attention to precedents in our own colonial history.
5. On the 12th of June, 1775, General Gage, the commander of the British forces, declared martial law in Boston. The battles of Concord and Lexington had been fought two months before. The colonial army was besieging the city and its British garrison. It was but five days before the battle of Bunker Hill. Parliament had, in the previous February, declared the colonies in a state of rebellion. Yet, by the common consent of English jurists, General Gage violated the laws of England, and laid himself liable to its penalty, when he declared martial law. This position is sustained in the opinion of Woodbury, J., in Luther v. Borden.[]
6. On the 7th of November, 1775, Lord Dunmore declared martial law throughout the commonwealth of Virginia. This was long after the battle of Bunker Hill, and when war was flaming throughout the colonies; yet he was denounced by the Virginia Assembly for having assumed a power which the king himself dared not exercise, as it "annuls the law of the land, and introduces the most execrable of all systems, martial law." Woodbury, J.,[] declares the act of Lord Dunmore unwarranted by British law.
7. The practice of our Revolutionary fathers on this subject is instructive. Their conduct throughout the great struggle for independence was equally marked by respect for civil law, and jealousy of martial law.[§] Though Washington was clothed with almost dictatorial powers, he did not presume to override the civil law, or disregard the orders of the courts, except by express authority of Congress or the States. In his file of general orders, covering a period of *51 five years, there are but four instances in which civilians appear to have been tried by a military court, and all these trials were expressly authorized by resolutions of Congress. In the autumn of 1777, the gloomiest period of the war, a powerful hostile army landed at Chesapeake Bay, for the purpose of invading Maryland and Pennsylvania. It was feared that the disloyal inhabitants along his line of march would give such aid and information to the British commander as to imperil the safety of our cause. Congress resolved "That the executive authorities of Pennsylvania and Maryland be requested to cause all persons within their respective States, notoriously disaffected, to be forthwith apprehended, disarmed, and secured till such time as the respective States think they can be released without injury to the common cause." The governor authorized the arrests, and many disloyal citizens were taken into custody by Washington's officers, who refused to answer the writ of habeas corpus which a civil court issued for the release of the prisoners. Very soon afterwards the Pennsylvania legislature passed a law indemnifying the governor and the military authorities, and allowing a similar course to be pursued thereafter on recommendation of Congress or the commanding officer of the army. But this law gave authority only to arrest and hold  not to try; and the act was to remain in force only till the end of the next session of the General Assembly. So careful were our fathers to recognize the supremacy of civil law, and to resist all pretensions of the authority of martial law!
8. Shay's Rebellion in 1787. That rebellion, which was before the Constitution was adopted, was mentioned by Hamilton in the Federalist as a proof that we needed a strong central government to preserve our liberties. During all that disturbance there was no declaration of martial law, and the habeas corpus was only suspended for a limited time and with very careful restrictions. Governor Bowdoin's order to General Lincoln, on the 19th of January, 1787, was in these words: "Consider yourself in all your military offensive operations constantly as under the direction of the civil *52 officer, save where any armed force shall appear to oppose you marching to execute these orders."
9. I refer too to a case under the Constitution, the Rebellion of 1793, in Western Pennsylvania. President Washington did not march with his troops until the judge of the United States District Court had certified that the marshal was unable to execute his warrants. Though the parties were tried for treason, all the arrests were made by the authority of the civil officers. The orders of the Secretary of War stated that "the object of the expedition was to assist the marshal of the district to make prisoners." Every movement was made under the direction of the civil authorities. So anxious was Washington on this subject that he issued orders declaring that "the army should not consider themselves as judges or executioners of the laws, but only as employed to support the proper authorities in the execution of the laws."
10. I call the attention of the court also to the case of General Jackson, in 1815, at New Orleans. In 1815, at New Orleans, General Jackson took upon himself the command of every person in the city, suspended the functions of all the civil authorities, and made his own will for a time the only rule of conduct. It was believed to be absolutely necessary. Judges, officers of the city corporation, and members of the State legislature insisted on it as the only way to save the citizens and property of the place from the unspeakable outrages committed at Badajos and St. Sebastian by the very same troops then marching to the attack. Jackson used the power thus taken by him moderately, sparingly, benignly, and only for the purpose of preventing mutiny in his camp. A single mutineer was restrained by a short confinement, and another was sent four miles up the river. But after he had saved the city, and the danger was all over, he stood before the court to be tried by the law; his conduct was decided to be illegal, and he paid the penalty without a murmur. The Supreme Court of Louisiana, in Johnson v. Duncan,[*] decided that everything done during the *53 siege in pursuance of martial rule, but in conflict with the law of the land, was void and of none effect, without reference to the circumstances which made it necessary. In 1842, a bill was introduced into Congress to reimburse General Jackson for the fine. The debate was able and thorough. Mr. Buchanan, then a member of Congress, spoke in its favor, and no one will doubt his willingness to put the conduct of Jackson on the most favorable ground possible.[*] Yet he did not attempt to justify, but only sought to palliate and excuse the conduct of Jackson. All the leading members took the same ground.
11. I may fortify my argument by the authority of two great British jurists, and call attention to the trial of the Rev. John Smith, missionary at Demerara, in British Guiana. In the year 1823, a rebellion broke out in Demerara, extending over some fifty plantations. The governor of the district immediately declared martial law. A number of the insurgents were killed, and the rebellion was crushed. It was alleged that the Rev. John Smith, a missionary, sent out by the London Missionary Society, had been an aider and abettor of the rebellion. A court-martial was appointed, and in order to give it the semblance of civil law, the governor-general appointed the chief justice of the district as a staff officer, and then detailed him as president of the court to try the accused. All the other members of the court were military men, and he was made a military officer for the special occasion. Missionary Smith was tried, found guilty, and sentenced to be hung. The proceedings came to the notice of Parliament, and were made the subject of inquiry and debate. Smith died in prison before the day of execution; but the trial gave rise to one of the ablest debates of the century, in which the principles involved in the cause now before this court were fully discussed. Lord Brougham and Sir James Mackintosh were among the speakers. In the course of his speech Lord Brougham said:
"No such thing as martial law is recognized in Great Britain, *54 and courts founded on proclamations of martial law are wholly unknown. Suppose I am ready to admit that, on the pressure of a great necessity, such as invasion or rebellion, when there is no time for the slow and cumbrous proceedings of the civil law, a proclamation may justifiably be issued for excluding the ordinary tribunals, and directing that offences should be tried by a military court, such a proceeding might be justified by necessity, but it could rest on that alone. Created by necessity, necessity must limit its continuance. It would be the worst of all conceivable grievances, it would be a calamity unspeakable, if the whole law and constitution of England were suspended one hour longer than the most imperious necessity demanded. I know that the proclamation of martial law renders every man liable to be treated as a soldier. But the instant the necessity ceases, that instant the state of soldiership ought to cease, and the rights, with the relations of civil life, to be restored."
Sir James Mackintosh says:[*]
"The only principle on which the law of England tolerates what is called `martial law,' is necessity. Its introduction can be justified only by necessity; its continuance requires precisely the same justification of necessity; and if it survives the necessity, in which alone it rests, for a single minute, it becomes instantly a mere exercise of lawless violence. When foreign invasion or civil war renders it impossible for courts of law to sit, or to enforce the execution of their judgments, it becomes necessary to find some rude substitute for them, and to employ for that purpose the military, which is the only remaining force in the community."
The next paragraph lays down the chief condition that can justify martial law, and also marks the boundary between martial and civil law:
"While the laws are silenced by the noise of arms, the rulers of the armed force must punish, as equitably as they can, those crimes which threaten their own safety and that of society, but no longer; every moment beyond is usurpation. As soon as *55 the laws can act, every other mode of punishing supposed crimes is itself an enormous crime. If argument be not enough on this subject  if, indeed, the mere statement be not the evidence of its own truth  I appeal to the highest and most venerable authority known to our law."
He proceeds to quote Sir Matthew Hale on Martial Law, and cites the case of the Earl of Lancaster, to which I have already referred, and then declares:
"No other doctrine has ever been maintained in this country since the solemn parliamentary condemnation of the usurpations of Charles I, which he was himself compelled to sanction in the Petition of Right. In none of the revolutions or rebellions which have since occurred has martial law been exercised, however much, in some of them, the necessity might seem to exist. Even in those most deplorable of all commotions which tore Ireland in pieces in the last years of the eighteenth century, in the midst of ferocious revolt and cruel punishment, at the very moment of legalizing these martial jurisdictions in 1799, the very Irish statute, which was passed for that purpose, did homage to the ancient and fundamental principles of the law in the very act of departing from them. The Irish statute (39 George III, chap. 3), after reciting `that martial law had been successfully exercised to the restoration of peace, so far as to permit the course of the common law partially to take place, but that the rebellion continued to rage in considerable parts of the kingdom, whereby it has become necessary for Parliament to interpose,' goes on to enable the Lord Lieutenant `to punish rebels by courts-martial.' This statute is the most positive declaration, that where the common law can be exercised in some parts of the country, martial law cannot be established in others, though rebellion actually prevails in those others, without an extraordinary interposition of the supreme legislative authority itself."
After presenting arguments to show that a declaration of martial law was not necessary, the learned jurist continues:
"For six weeks, then, before the court-martial was assembled, and for twelve weeks before that court pronounced sentence of *56 death on Mr. Smith, all hostility had ceased, no necessity for their existence can be pretended, and every act which they did was an open and deliberate defiance of the law of England. Where, then, are we to look for any color of law in these proceedings? Do they derive it from the Dutch law? I have diligently examined the Roman law, which is the foundation of that system, and the writings of those most eminent jurists who have contributed so much to the reputation of Holland. I can find in them no trace of any such principle as martial law. Military law, indeed, is clearly defined; and provision is made for the punishment, by military judges, of the purely military offences of soldiers. But to any power of extending military jurisdiction over those who are not soldiers, there is not an allusion."
Many more such precedents as I have already cited might be added to the list; but it is unnecessary. They all teach the same lesson. They enable us to trace, from its far-off source, the progress and development of Anglo-Saxon liberty; its conflicts with irresponsible power; its victories, dearly bought, but always won  victories which have crowned with immortal honors the institutions of England, and left their indelible impress upon the Anglo-Saxon mind. These principles our fathers brought with them to the New World, and guarded with vigilance and devotion. During the late Rebellion, the Republic did not forget them. So completely have they been impressed on the minds of American lawyers, so thoroughly ingrained into the fibre of American character, that notwithstanding the citizens of eleven States went off into rebellion, broke their oaths of allegiance to the Constitution, and levied war against their country, yet with all their crimes upon them, there was still in the minds of those men, during all the struggle, so deep an impression on this great subject, that, even during their rebellion, the courts of the Southern States adjudicated causes, like the one now before you, in favor of the civil law, and against courts-martial established under military authority for the trial of citizens. In Texas, Mississippi, Virginia, and other insurgent States, by the order of the rebel President, the *57 writ of habeas corpus was supended, martial law was declared, and provost marshals were appointed to administer military authority. But when civilians, arrested by military authority, petitioned for release by writ of habeas corpus, in every case, save one, the writ was granted, and it was decided that there could be no suspension of the writ or declaration of martial law by the executive, or by any other than the supreme legislative authority.
The military commission, under our government, is of recent origin. It was instituted, as has been frequently said, by General Scott, in Mexico, to enable him, in the absence of any civil authority, to punish Mexican and American citizens for offences not provided for in the rules and articles of war. The purpose and character of a military commission may be seen from his celebrated order, No. 20, published at Tampico. It was no tribunal with authority to punish, but merely a committee appointed to examine an offender, and advise the commanding general what punishment to inflict. It is a rude substitute for a court of justice, in the absence of civil law. Even our own military authorities, who have given so much prominence to these commissions, do not claim for them the character of tribunals established by law. In his "Digest of Opinions" for 1866,[*] the Judge Advocate General says:
"Military commissions have grown out of the necessities of the service, but their powers have not been defined nor their mode of proceeding regulated by any statute law."
Again:
"In a military department the military commission is a substitute for the ordinary State or United States Court, when the latter is closed by the exigencies of war or is without the jurisdiction of the offence committed."
The plea set up by the Attorney-General for this military tribunal is that of the necessity of this case. But there was *58 in fact no necessity. From the beginning of the Rebellion to its close, Congress, by its legislation, kept pace with the necessities of the nation. In sixteen carefully considered laws, the national legislature undertook to provide for every contingency, and arm the executive at every point with the solemn sanction of law. Observe how the case of the petitioner was covered by the provisions of law.
The first charge against him was "conspiracy against the government of the United States." In the act approved July 31st, 1861, that crime was defined, and placed within the jurisdiction of the District and Circuit Courts of the United States.
Charge 2. "Affording aid and comfort to the rebels against the authority of the United States." In the act approved July 17th, 1862, this crime is set forth in the very words of the charge, and it is provided that "on conviction before any court of the United States, having jurisdiction thereof, the offender shall be punished by a fine not exceeding ten thousand dollars, and by imprisonment not less than six months, nor exceeding five years."
Charge 3. "Inciting insurrection." In Brightly's Digest,[*] there is compiled from ten separate acts, a chapter of sixty-four sections on insurrection, setting forth in the fullest manner possible, every mode by which citizens may aid in insurrection, and providing for their trial and punishment by the regularly ordained courts of the United States.
Charge 4. "Disloyal practices." The meaning of this charge can only be found in the specifications under it, which consists in discouraging enlistments and making preparations to resist a draft designed to increase the army of the United States. These offences are fully defined in the thirty-third section of the act of March 3d, 1863, "for enrolling and calling out the national forces," and in the twelfth section of the act of February 24th, 1864, amendatory thereof. The provost marshal is authorized to arrest such offenders, but he must deliver them over for trial to the civil authorities. *59 Their trial and punishment are expressly placed in the jurisdiction of the District and Circuit Courts of the United States.
Charge 5. "Violation of the laws of war;" which, according to the specifications, consisted of an attempt, through a secret organization, to give aid and comfort to rebels. This crime is amply provided for in the laws referred to in relation to the second charge.
But Congress did far more than to provide for a case like this. Throughout the eleven rebellious States, it clothed the military department with supreme power and authority. State constitutions and laws, the decrees and edicts of courts, were all superseded by the laws of war. Even in States not in rebellion, but where treason had a foothold, and hostile collisions were likely to occur, Congress authorized the suspension of the writ of habeas corpus, and directed the army to keep the peace. But Congress went further still, and authorized the President, during the Rebellion, whenever, in his judgment, the public safety should require it, to suspend the privilege of the writ in any State or Territory of the United States, and order the arrest of any persons whom he might believe dangerous to the safety of the Republic, and hold them till the civil authorities could examine into the nature of their crimes. But this act of March 3d, 1863, gave no authority to try the person by any military tribunal, and it commanded judges of the Circuit and District Courts of the United States, whenever the grand jury had adjourned its sessions, and found no indictment against such persons, to order their immediate discharge from arrest. All these capacious powers were conferred upon the military department, but there is no law on the statute book, in which the tribunal that tried the petitioner can find the least recognition.
What have our Representatives in Congress thought on this subject?
Near the close of the Thirty-Eighth Congress, when the miscellaneous appropriation bill, which authorized the disbursement of several millions of dollars for the civil expenditures *60 of the government, was under discussion, the House of Representatives, having observed with alarm the growing tendency to break down the barriers of law, and desiring to protect the rights of citizens as well as to preserve the Union, added to the appropriation bill the following section:
"And be it further enacted, That no person shall be tried by court-martial or military commission in any State or Territory where the courts of the United States are open, except persons actually mustered or commissioned or appointed in the military or naval service of the United States, or rebel enemies charged with being spies."
It was debated at length in the Senate, and almost every Senator acknowledged its justice, yet, as the nation was then in the very midst of the war, it was feared that the Executive might thereby be crippled, and the section was stricken out. The bill came back to the House; conferences were held upon it, and finally, in the last hour of the session, the House deliberately determined that, important as the bill was to the interests of the country, they preferred it should not become a law if that section were stricken out.
The bill failed; and the record of its failure is an emphatic declaration that the House of Representatives have never consented to the establishment of any tribunals except those authorized by the Constitution of the United States and the laws of Congress.
A point is suggested by the opposing counsel, that if the military tribunal had no jurisdiction, the petitioners may be held as prisoners captured in war, and handed over by the military to the civil authorities, to be tried for their crimes under the acts of Congress and before the courts of the United States. The answer to this is that the petitioners were never enlisted, commissioned, or mustered into the service of the Confederacy; nor had they been within the rebel lines, or within any theatre of active military operations; nor had they been in any way recognized by the rebel authorities as in their service. They could not have been exchanged as prisoners of war; nor, if all the charges against *61 them were true, could they be brought under the legal definition of spies. The suggestion that they should be handed over to the civil authorities for trial is precisely what they petitioned for, and what, according to the laws of Congress, should have been done.
Mr. Black, on the same side:
Had the commissioners jurisdiction? Were they invested with legal authority to try the petitioner and put him to death for the offence of which he was accused? This is the main question in the controversy, and the main one upon which the court divided. We answer, that they were not; and, therefore, that the whole proceeding from beginning to end was null and void.
On the other hand, it is necessary for those who oppose us to assert, and they do assert, that the commissioners had complete legal jurisdiction both of the subject-matter and of the party, so that their judgment upon the law and the facts is absolutely conclusive and binding, not subject to correction nor open to inquiry in any court whatever. Of these two opposite views, the court must adopt one or the other. There is no middle ground on which to stand.
The men whose acts we complain of erected themselves, it will be remembered, into a tribunal for the trial and punishment of citizens who were connected in no way whatever with the army or navy. And this they did in the midst of a community whose social and legal organization had never been disturbed by any war or insurrection, where the courts were wide open, where judicial process was executed every day without interruption, and where all the civil authorities, both state and national, were in the full exercise of their functions.
It is unimportant whether the petitioner was intended to be charged with treason or conspiracy, or with some offence of which the law takes no notice. Either or any way, the men who undertook to try him had no jurisdiction of the subject-matter.
Nor had they jurisdiction of the party. The case, not *62 having been one of impeachment, or a case arising in the land or naval forces, is either nothing at all or else it is a simple crime against the United States, committed by private individuals not in the public service, civil or military. Persons standing in that relation to the government are answerable for the offences which they may commit only to the civil courts of the country. So says the Constitution, as we read it; and the act of Congress of March 3d, 1863, which was passed with reference to persons in the exact situation of this man, declares that they shall be delivered up for trial to the proper civil authorities.
There being no jurisdiction of the subject-matter or of the party, you are bound to relieve the petitioner. It is as much the duty of a judge to protect the innocent as it is to punish the guilty.
We submit that a person not in the military or naval service cannot be punished at all until he has had a fair, open, public trial before an impartial jury, in an ordained and established court, to which the jurisdiction has been given by law to try him for that specific offence.
Our proposition ought to be received as true without any argument to support it; because, if that, or something precisely equivalent to it, be not a part of our law, then the country is not a free country. Nevertheless, we take upon ourselves the burden of showing affirmatively not only that it is true, but that it is immovably fixed in the very framework of the government, so that it is impossible to detach it without destroying the whole political structure under which we live.
In the first place, the self-evident truth will not be denied that the trial and punishment of an offender against the government is the exercise of judicial authority. That is a kind of authority which would be lost by being diffused among the masses of the people. A judge would be no judge if everybody else were a judge as well as he. Therefore, in every society, however rude or however perfect its organization, the judicial authority is always committed to the hands of particular persons, who are trusted to use it wisely and *63 well; and their authority is exclusive; they cannot share it with others to whom it has not been committed. Where, then, is the judicial power in this country? Who are the depositaries of it here? The Federal Constitution answers that question in very plain words, by declaring that "the judicial power of the United States shall be vested in one Supreme Court, and in such inferior courts as Congress may from time to time ordain and establish." Congress has, from time to time, ordained and established certain inferior courts; and, in them, together with the one Supreme Court to which they are subordinate, is vested all the judicial power, properly so called, which the United States can lawfully exercise. At the time the General Government was created, the States and the people bestowed upon that government a certain portion of the judicial power which otherwise would have remained in their own hands, but they gave it on a solemn trust, and coupled the grant of it with this express condition, that it should never be used in any way but one; that is, by means of ordained and established courts. Any person, therefore, who undertakes to exercise judicial power in any other way, not only violates the law of the land, but he tramples upon the most important part of that Constitution which holds these States together.
We all know that it was the intention of the men who founded this Republic to put the life, liberty, and property of every person in it under the protection of a regular and permanent judiciary, separate, apart, distinct, from all other branches of the government, whose sole and exclusive business it should be to distribute justice among the people according to the wants and needs of each individual. It was to consist of courts, always open to the complaint of the injured, and always ready to hear criminal accusations when founded upon probable cause; surrounded with all the machinery necessary for the investigation of truth, and clothed with sufficient power to carry their decrees into execution. In these courts it was expected that judges would sit who would be upright, honest, and sober men, learned in the laws of their country, and lovers of justice from the habitual *64 practice of that virtue; independent, because their salaries could not be reduced, and free from party passion, because their tenure of office was for life. Although this would place them above the clamors of the mere mob and beyond the reach of executive influence, it was not intended that they should be wholly irresponsible. For any wilful or corrupt violation of their duty, they are liable to be impeached; and they cannot escape the control of an enlightened public opinion, for they must sit with open doors, listen to full discussion, and give satisfactory reasons for the judgments they pronounce. In ordinary tranquil times the citizen might feel himself safe under a judicial system so organized.
But our wise forefathers knew that tranquillity was not to be always anticipated in a republic; the spirit of a free people is often turbulent. They expected that strife would rise between classes and sections, and even civil war might come, and they supposed, that in such times, judges themselves might not be safely trusted in criminal cases  especially in prosecutions for political offences, where the whole power of the executive is arrayed against the accused party. All history proves that public officers of any government when they are engaged in a severe struggle to retain their places, become bitter and ferocious, and hate those who oppose them, even in the most legitimate way, with a rancor which they never exhibit towards actual crime. This kind of malignity vents itself in prosecutions for political offences, sedition, conspiracy, libel, and treason, and the charges are generally founded upon the information of spies and delators, who make merchandise of their oaths, and trade in the blood of their fellow men. During the civil commotions in England, which lasted from the beginning of the reign of Charles I to the Revolution of 1688, the best men, and the purest patriots that ever lived, fell by the hand of the public executioner. Judges were made the instruments for inflicting the most merciless sentences on men, the latchet of whose shoes the ministers that prosecuted them were not worthy to stoop down and unloose. Nothing has occurred, indeed, in the history of this country to justify the doubt of *65 judicial integrity which our forefathers seem to have felt. On the contrary, the highest compliment that has ever been paid to the American bench, is embodied in this simple fact, that if the executive officers of this government have ever desired to take away the life or the liberty of a citizen contrary to law, they have not come into the courts to get it done, they have gone outside of the courts, and stepped over the Constitution, and created their own tribunals. But the framers of the Constitution could act only upon the experience of that country whose history they knew most about, and there they saw the ferocity of Jeffreys and Scroggs, the timidity of Guilford, and the venality of such men as Saunders and Wright. It seems necessary, therefore, not only to make the judiciary as perfect as possible, but to give the citizen yet another shield against his government. To that end they could think of no better provision than a public trial before an impartial jury.
We do not assert that the jury trial is an infallible mode of ascertaining truth. Like everything human, it has its imperfections. We only say that it is the best protection for innocence and the surest mode of punishing guilt that has yet been discovered. It has borne the test of a longer experience, and borne it better than any other legal institution that ever existed among men. England owes more of her freedom, her grandeur, and her prosperity to that, than to all other causes put together. It has had the approbation not only of those who lived under it, but of great thinkers who looked at it calmly from a distance, and judged it impartially: Montesquieu and De Tocqueville speak of it with an admiration as rapturous as Coke and Blackstone. Within the present century, the most enlightened states of continental Europe have transplanted it into their countries; and no people ever adopted it once and were afterwards willing to part with it. It was only in 1830 that an interference with it in Belgium provoked a successful insurrection which permanently divided one kingdom into two. In the same year, the Revolution of the Barricades gave the right of trial by jury to every Frenchman.
*66 Those colonists of this country who came from the British Islands brought this institution with them, and they regarded it as the most precious part of their inheritance. The immigrants from other places where trial by jury did not exist became equally attached to it as soon as they understood what it was. There was no subject upon which all the inhabitants of the country were more perfectly unanimous than they were in their determination to maintain this great right unimpaired. An attempt was made to set it aside and substitute military trials in its place, by Lord Dunmore, in Virginia, and General Gage, in Massachusetts, accompanied with the excuse which has been repeated so often in late days, namely, that rebellion had made it necessary; but it excited intense popular anger, and every colony, from New Hampshire to Georgia, made common cause with the two whose rights had been especially invaded. Subsequently the Continental Congress thundered it into the ear of the world, as an unendurable outrage, sufficient to justify universal insurrection against the authority of the government which had allowed it to be done.
If the men who fought out our Revolutionary contest, when they came to frame a government for themselves and their posterity, had failed to insert a provision making the trial by jury perpetual and universal, they would have proved themselves recreant to the principles of that liberty of which they professed to be the special champions. But they were guilty of no such thing. They not only took care of the trial by jury, but they regulated every step to be taken in a criminal trial. They knew very well that no people could be free under a government which had the power to punish without restraint. Hamilton expressed, in the Federalist, the universal sentiment of his time, when he said, that the arbitrary power of conviction and punishment for pretended offences, had been the great engine of despotism in all ages and all countries. The existence of such a power is incompatible with freedom.
But our fathers were not absurd enough to put unlimited power in the hands of the ruler and take away the protection *67 of law from the rights of individuals. It was not thus that they meant "to secure the blessings of liberty to themselves and their posterity." They determined that not one drop of the blood which had been shed on the other side of the Atlantic, during seven centuries of contest with arbitrary power, should sink into the ground; but the fruits of every popular victory should be garnered up in this new government. Of all the great rights already won they threw not an atom away. They went over Magna Charta, the Petition of Right, the Bill of Rights, and the rules of the common law, and whatever was found there to favor individual liberty they carefully inserted in their own system, improved by clearer expression, strengthened by heavier sanctions, and extended by a more universal application. They put all those provisions into the organic law, so that neither tyranny in the executive, nor party rage in the legislature, could change them without destroying the government itself.
Look at the particulars and see how carefully everything connected with the administration of punitive justice is guarded.
1. No ex post facto law shall be passed. No man shall be answerable criminally for any act which was not defined and made punishable as a crime by some law in force at the time when the act was done.
2. For an act which is criminal he cannot be arrested without a judicial warrant founded on proof of probable cause. He shall not be kidnapped and shut up on the mere report of some base spy who gathers the materials of a false accusation by crawling into his house and listening at the keyhole of his chamber door.
3. He shall not be compelled to testify against himself. He may be examined before he is committed, and tell his own story if he pleases; but the rack shall be put out of sight, and even his conscience shall not be tortured; nor shall his unpublished papers be used against him, as was done most wrongfully in the case of Algernon Sydney.
4. He shall be entitled to a speedy trial; not kept in prison *68 for an indefinite time without the opportunity of vindicating his innocence.
5. He shall be informed of the accusation, its nature, and grounds. The public accuser must put the charge into the form of a legal indictment, so that the party can meet it full in the face.
6. Even to the indictment he need not answer unless a grand jury, after hearing the evidence, shall say upon their oaths that they believe it to be true.
7. Then comes the trial, and it must be before a regular court, of competent jurisdiction, ordained and established for the State and district in which the crime was committed; and this shall not be evaded by a legislative change in the district after the crime is alleged to be done.
8. His guilt or innocence shall be determined by an impartial jury. These English words are to be understood in their English sense, and they mean that the jurors shall be fairly selected by a sworn officer from among the peers of the party, residing within the local jurisdiction of the court. When they are called into the box he can purge the panel of all dishonesty, prejudice, personal enmity, and ignorance, by a certain number of peremptory challenges, and as many more challenges as he can sustain by showing reasonable cause.
9. The trial shall be public and open, that no underhand advantage may be taken. The party shall be confronted with the witnesses against him, have compulsory process for his own witnesses, and be entitled to the assistance of counsel in his defence.
10. After the evidence is heard and discussed, unless the jury shall, upon their oaths, unanimously agree to surrender him up into the hands of the court as a guilty man, not a hair of his head can be touched by way of punishment.
11. After a verdict of guilty he is still protected. No cruel or unusual punishment shall be inflicted, nor any punishment at all, except what is annexed by the law to his offence. It cannot be doubted for a moment that if a person convicted of an offence not capital were to be hung on the *69 order of a judge, such judge would be guilty of murder as plainly as if he should come down from the bench, turn up the sleeves of his gown, and let out the prisoner's blood with his own hand.
12. After all is over, the law continues to spread its guardianship around him. Whether he is acquitted or condemned he shall never again be molested for that offence. No man shall be twice put in jeopardy of life or limb for the same cause.
These rules apply to all criminal prosecutions. But in addition to these, certain special regulations were required for treason,  the one great political charge under which more innocent men have fallen than any other. A tyrannical government calls everybody a traitor who shows the least unwillingness to be a slave. In the absence of a constitutional provision it was justly feared that statutes might be passed which would put the lives of the most patriotic citizens at the mercy of minions that skulk about under the pay of an executive. Therefore a definition of treason was given in the fundamental law, and the legislative authority could not enlarge it to serve the purpose of partisan malice. The nature and amount of evidence required to prove the crime was also prescribed, so that prejudice and enmity might have no share in the conviction. And lastly, the punishment was so limited that the property of the party could not be confiscated and used to reward the agents of his prosecutors, or strip his family of their subsistence.
If these provisions exist in full force, unchangeable and irrepealable, then we are not hereditary bondsmen. Every citizen may safely pursue his lawful calling in the open day; and at night, if he is conscious of innocence, he may lie down in security, and sleep the sound sleep of a freeman.
They are in force, and they will remain in force. We have not surrendered them, and we never will. The great race to which we belong has not degenerated.
But how am I to prove the existence of these rights? I do not propose to do it by a long chain of legal argumentation, nor by the production of numerous books with the *70 leaves turned down and the pages marked. If it depended upon judicial precedents, I think I could produce as many as might be necessary. If I claimed this freedom, under any kind of prescription, I could prove a good long possession in ourselves and those under whom we claim it. I might begin with Tacitus, and show how the contest arose in the forests of Germany more than two thousand years ago; how the rough virtues and sound common sense of that people established the right of trial by jury, and thus started on a career which has made their posterity the foremost race that ever lived in all the tide of time. The Saxons carried it to England, and were ever ready to defend it with their blood. It was crushed out by the Danish invasion; and all that they suffered of tyranny and oppression, during the period of their subjugation, resulted from the want of trial by jury. If that had been conceded to them, the reaction would not have taken place which drove back the Danes to their frozen homes in the North. But those ruffian seakings could not understand that, and the reaction came. Alfred, the greatest of revolutionary heroes and the wisest monarch that ever sat on a throne, made the first use of his power, after the Saxons restored it, to re-establish their ancient laws. He had promised them that he would, and he was true to them because they had been true to him. But it was not easily done; the courts were opposed to it, for it limited their power  a kind of power that everybody covets  the power to punish without regard to law. He was obliged to hang forty-four judges in one year for refusing to give his subjects a trial by jury. When the historian says that he hung them, it is not meant that he put them to death without a trial. He had them impeached before the grand council of the nation, the Wittenagemote, the Parliament of that time. During the subsequent period of Saxon domination, no man on English soil was powerful enough to refuse a legal trial to the meanest peasant. If any minister or any king, in war or in peace, had dared to punish a freeman by a tribunal of his own appointment, he would have roused the wrath of the whole population; all orders *71 of society would have resisted it; lord and vassal, knight and squire, priest and penitent, bocman and socman, master and thrall, copyholder and villein, would have risen in one mass and burnt the offender to death in his castle, or followed him in his flight and torn him to atoms. It was again trampled down by the Norman conquerors; but the evils resulting from the want of it united all classes in the effort which compelled King John to restore it by the Great Charter. Everybody is familiar with the struggles which the English people, during many generations, made for their rights with the Plantagenets, the Tudors, and the Stuarts, and which ended finally in the Revolution of 1688, when the liberties of England were placed upon an impregnable basis by the Bill of Rights.
Many times the attempt was made to stretch the royal authority far enough to justify military trials; but it never had more than temporary success. Five hundred years ago Edward II closed up a great rebellion by taking the life of its leader, the Earl of Lancaster, after trying him before a military court. Eight years later that same king, together with his lords and commons in Parliament assembled, acknowledged with shame and sorrow that the execution of Lancaster was a mere murder, because the courts were open, and he might have had a legal trial. Queen Elizabeth, for sundry reasons affecting the safety of the state, ordered that certain offenders not of her army should be tried according to the law martial. But she heard the storm of popular vengeance rising, and, haughty, imperious, self-willed as she was, she yielded the point; for she knew that upon that subject the English people would never consent to be trifled with. Strafford, as Lord Lieutenant of Ireland, tried the Viscount Stormont before a military commission, and executed him. When impeached, he pleaded in vain that Ireland was in a state of insurrection, that Stormont was a traitor, and the army would be undone if it could not defend itself without appealing to the civil courts. The Parliament was deaf; the king himself could not save him; he was condemned to suffer death as a traitor and a murderer. Charles I *72 issued commissions to divers officers for the trial of his enemies according to the course of military law. If rebellion ever was an excuse for such an act, he could surely have pleaded it; for there was scarcely a spot in his kingdom, from sea to sea, where the royal authority was not disputed by somebody. Yet the Parliament demanded, in their petition of right, and the king was obliged to concede, that all his commissions were illegal. James II claimed the right to suspend the operation of the penal laws  a power which the courts denied  but the experience of his predecessors taught him that he could not suspend any man's right to a trial. He could easily have convicted the seven bishops of any offence he saw fit to charge them with, if he could have selected their judges from among the mercenary creatures to whom he had given commands in his army. But this he dared not do. He was obliged to send the bishops to a jury, and endure the mortification of seeing them acquitted. He, too, might have had rebellion for an excuse, if rebellion be an excuse. The conspiracy was already ripe which, a few months afterwards, made him an exile and an outcast; he had reason to believe that the Prince of Orange was making his preparations, on the other side of the Channel, to invade the kingdom, where thousands burned to join him; nay, he pronounced the bishops guilty of rebellion by the very act for which he arrested them. He had raised an army to meet the rebellion, and he was on Hounslow Heath reviewing the troops organized for that purpose, when he heard the great shout of joy that went up from Westminster Hall, was echoed back from Temple Bar, spread down the city and over the Thames, and rose from every vessel on the river  the simultaneous shout of two hundred thousand men for the triumph of justice and law.
The truth is, that no authority exists anywhere in the world for the doctrine of the Attorney-General. No judge or jurist, no statesman or parliamentary orator, on this or the other side of the water, sustains him. Every elementary writer is against him. All military authors who profess to know the duties of their profession admit themselves to be under, *73 not above the laws. No book can be found in any library to justify the assertion that military tribunals may try a citizen at a place where the courts are open. When I say no book, I mean, of course, no book of acknowledged authority. I do not deny that hireling clergymen have often been found to dishonor the pulpit by trying to prove the divine right of kings and other rulers to govern as they please. Court sycophants and party hacks have many times written pamphlets, and perhaps large volumes, to show that those whom they serve should be allowed to work out their bloody will upon the people. No abuse of power is too flagrant to find its defenders.
But this case does not depend on authority. It is rather a question of fact than of law.
I prove my right to a trial by jury just as I would prove my title to an estate, if I held in my hand a solemn deed conveying it to me, coupled with undeniable evidence of long and undisturbed possession under and according to the deed. There is the charter by which we claim to hold it. It is called the Constitution of the United States. It is signed with the sacred name of George Washington, and with thirty-nine other names, only less illustrious than his. They represented every independent State then upon this continent, and each State afterwards ratified their work by a separate convention of its own people. Every State that subsequently came in acknowledged that this was the great standard by which their rights were to be measured. Every man that has ever held office in the country, from that time to this, has taken an oath that he would support and sustain it through good report and through evil. The Attorney-General himself became a party to the instrument when he laid his hand upon the holy gospels, and swore that he would give to me and every other citizen the full benefit of all it contains.
What does it contain? This among other things:
"The trial of all crimes except in cases of impeachment shall be by jury."
*74 Again:
"No person shall be held to answer for a capital or otherwise infamous crime unless on a presentment or indictment of a grand jury, except in cases arising in the land or naval forces, or in the militia when in actual service in time of war or public danger; nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb, nor be compelled, in any criminal case, to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use without just compensation."
This is not all; another article declares that,
"In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial by an impartial jury of the state and district wherein the crime shall have been committed, which district shall have been previously ascertained by law; and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for the witnesses in his favor; and to have the assistance of counsel for his defence."
Is there any ambiguity there? If that does not signify that a jury trial shall be the exclusive and only means of ascertaining guilt in criminal cases, then I demand to know what words, or what collocation of words in the English language would have that effect? Does this mean that a fair, open, speedy, public trial by an impartial jury shall be given only to those persons against whom no special grudge is felt by the Attorney-General, or the judge-advocate, or the head of a department? Shall this inestimable privilege be extended only to men whom the administration does not care to convict? Is it confined to vulgar criminals, who commit ordinary crimes against society, and shall it be denied to men who are accused of such offences as those for which Sydney and Russell were beheaded, and Alice Lisle was hung, and Elizabeth Gaunt was burnt alive, and John Bunyan was imprisoned fourteen years, and Baxter was whipped at the cart's tail, and Prynn had his ears cut off? *75 No; the words of the Constitution are all-embracing, "as broad and general as the casing air." The trial of ALL crimes shall be by jury. ALL persons accused shall enjoy that privilege  and NO person shall be held to answer in any other way.
That would be sufficient without more. But there is another consideration which gives it tenfold power. It is a universal rule of construction, that general words in any instrument, though they may be weakened by enumeration, are always strengthened by exceptions. Here is no attempt to enumerate the particular cases in which men charged with criminal offences shall be entitled to a jury trial. It is simply declared that all shall have it. But that is coupled with a statement of two specific exceptions: cases of impeachment; and cases arising in the land or naval forces. These exceptions strengthen the application of the general rule to all other cases. Where the lawgiver himself has declared when and in what circumstances you may depart from the general rule, you shall not presume to leave that onward path for other reasons, and make different exceptions. To exceptions the maxim is always applicable, that expressio unius exclusio est alterius.
But we shall be answered that the judgment under consideration was pronounced in time of war, and it is, therefore, at least, morally excusable. There may, or there may not, be something in that. I admit that the merits or demerits of any particular act, whether it involve a violation of the Constitution or not, depend upon the motives that prompted it, the time, the occasion, and all the attending circumstances. When the people of this country come to decide upon the acts of their rulers, they will take all these things into consideration. But that presents the political aspect of the case, with which we have nothing to do here. I would only say, in order to prevent misapprehension, that I think it is precisely in a time of war and civil commotion that we should double the guards upon the Constitution. In peaceable and quiet times, our legal rights are in little danger of being overborne; but when the wave of power *76 lashes itself into violence and rage, and goes surging up against the barriers which were made to confine it, then we need the whole strength of an unbroken Constitution to save us from destruction.
There has been and will be another quasi political argument,  necessity. If the law was violated because it could not be obeyed, that might be an excuse. But no absolute compulsion is pretended here. These commissioners acted, at most, under what they regarded as a moral necessity. The choice was left them to obey the law or disobey it. The disobedience was only necessary as means to an end which they thought desirable; and now they assert that though these means are unlawful and wrong, they are made right, because without them the object could not be accomplished; in other words, the end justifies the means. There you have a rule of conduct denounced by all law, human and divine, as being pernicious in policy and false in morals.
Nothing that the worst men ever propounded has produced so much oppression, misgovernment, and suffering, as this pretence of state necessity. A great authority calls it the tyrant's plea; and the common honesty of all mankind has branded it with infamy.
Of course, it is mere absurdity to say that the petitioner was necessarily deprived of his right to a fair and legal trial. But concede for the argument's sake that a trial by jury was wholly impossible; admit that there was an absolute, overwhelming, imperious necessity operating so as literally to compel every act which the commissioners did, would that give their sentence of death the validity and force of a legal judgment pronounced by an ordained and established court? The question answers itself. This trial was a violation of law, and no necessity could be more than a mere excuse for those who committed it. If the commissioners were on trial for murder or conspiracy to murder, they might plead necessity if the fact were true, just as they would plead insanity or anything else to show that their guilt was not wilful. But we are now considering the legal effect of their decision, and that depends on their legal authority *77 to make it. They had no such authority; they usurped a jurisdiction which the law not only did not give them, but expressly forbade them to exercise, and it follows that their act is void, whatever may have been the real or supposed excuse for it.
If these commissioners, instead of aiming at the life and liberty of the petitioner, had attempted to deprive him of his property by a sentence of confiscation, would any court in Christendom declare that such a sentence divested the title? Or would a person claiming under the sentence make his right any better by showing that the illegal assumption of jurisdiction was accompanied by some excuse which might save the commissioners from a criminal prosecution?
That a necessity for violating the law is nothing more than a mere excuse to the perpetrator, and does not in any legal sense change the quality of the act itself in its operation upon other parties, is a proposition too plain on original principles to need the aid of authority. I do not see how any man is to stand up and dispute it. But there is decisive authority upon the point.[*]
The counsel on the other side will not assert that there was war at Indianapolis in 1864, for they have read Coke's Institute, and the opinion of Mr. Justice Grier, in the Prize Cases, and they know it to be a settled rule that war cannot be said to exist where the civil courts are open. They will not set up the plea of necessity, for they are well aware that it would not be true in point of fact. They will hardly take the ground that any kind of necessity could give legal validity to that which the law forbids.
This, therefore, must be their position: that although there was no war at the place where this commission sat, and no actual necessity for it, yet if there was a war anywhere else, to which the United States were a party, the technical effect of such war was to take the jurisdiction away from the civil courts and transfer it to army officers. Nothing *78 else is left them. They may not state their proposition precisely as I state it; that is too plain a way of putting it. But, in substance, it is their doctrine. What else can they say? They will admit that the Constitution is not altogether without a meaning; that at a time of universal peace it imposes some kind of obligation upon those who swear to support it. If no war existed they would not deny the exclusive jurisdiction of the civil courts in criminal cases. How then did the military get jurisdiction in Indiana?
They must answer the question by saying that military jurisdiction comes from the mere existence of war; and it comes in Indiana only as the legal result of a war which is going on in Mississippi, Tennessee, or South Carolina. The Constitution is repealed, or its operation suspended in one state because there is war in another. The courts are open, the organization of society is intact, the judges are on the bench, and their process is not impeded; but their jurisdiction is gone. Why? For no reason, if not because war exists, and the silent, legal, technical operation of that fact is to deprive all American citizens of their right to a fair trial.
That class of jurists and statesmen who hold that the trial by jury is lost to the citizen during the existence of war, must carry out their doctrine theoretically and practically to its ultimate consequences. The right of trial by jury being gone, all other rights are gone with it; therefore a man may be arrested without an accusation and kept in prison during the pleasure of his captors; his papers may be searched without a warrant; his property may be confiscated behind his back, and he has no earthly means of redress. Nay, an attempt to get a just remedy is construed as a new crime. He dare not even complain, for the right of free speech is gone with the rest of his rights. If you sanction that doctrine, what is to be the consequence? I do not speak of what is past and gone; but in case of a future war what results will follow from your decision indorsing the Attorney-General's views? They are very obvious. At the instant when the war begins, our whole system of legal government will tumble *79 into ruin, and if we are left in the enjoyment of any privileges at all we will owe it not to the Constitution and laws, but to the mercy or policy of those persons who may then happen to control the organized physical force of the country.
This puts us in a most precarious condition; we must have war often, do what we may to avoid it. The President or the Congress can provoke it, and they can keep it going even after the actual conflict of arms is over. They could make war a chronic condition of the country, and the slavery of the people perpetual. Nay, we are at the mercy of any foreign potentate who may envy us the possession of those liberties which we boast of so much; he can shatter our Constitution without striking a single blow or bringing a gun to bear upon us. A simple declaration of hostilities is more terrible to us than an army with banners.
To me the argument set up by the other side seems a delusion simply. In a time of war, more than at any other time, Public Liberty is in the hands of the public officers. And she is there in double trust; first, as they are citizens, and therefore bound to defend her, by the common obligation of all citizens; and next, as they are her special guardians. The opposing argument, when turned into its true sense, means this, and this only: that when the Constitution is attacked upon one side, its official guardians may assail it upon the other; when rebellion strikes it in the face, they may take advantage of the blindness produced by the blow, to stab it in the back.
The Convention when it framed the Constitution, and the people when they adopted it, could have had no thought like that. If they had supposed that it would operate only while perfect peace continued, they certainly would have given us some other rule to go by in time of war; they would not have left us to wander about in a wilderness of anarchy, without a lamp to our feet, or a guide to our path. Another thing proves their actual intent still more strikingly. They required that every man in any kind of public employment, state or national, civil or military, should swear, without *80 reserve or qualification, that he would support the Constitution. Surely our ancestors had too much regard for the moral and religious welfare of their posterity, to impose upon them an oath like that, if they intended and expected it to be broken half the time.
These statesmen who settled our institutions, had no such notions in their minds. Washington deserved the lofty praise bestowed upon him by the president of Congress when he resigned his commission,  that he had always regarded the rights of the civil authority through all changes and through all disasters. When his duty as President afterwards required him to arm the public force to suppress a rebellion in Western Pennsylvania, he never thought that the Constitution was abolished, by virtue of that fact, in New Jersey, or Maryland, or Virginia.
Opposite counsel must be conscious that when they deny the binding obligation of the Constitution they must put some other system of law in its place. They do so; and argue that, while the Constitution, and the acts of Congress, and Magna Charta, and the common law, and all the rules of natural justice remain under foot, they will try American citizens according to what they call the laws of war.
But what do they mean by this? Do they mean that code of public law which defines the duties of two belligerent parties to one another, and regulates the intercourse of neutrals with both? If yes, then it is simply a recurrence to the law of nations, which has nothing to do with the subject. Do they mean that portion of our municipal code which defines our duties to the government in war as well as in peace? Then they are speaking of the Constitution and laws, which declare in plain words that the government owes every citizen a fair legal trial, as much as the citizen owes obedience to the government. When they appeal to international law, it is silent; and when they interrogate the law of the land, the answer is a contradiction of their whole theory.
The Attorney-General conceives that all persons whom he and his associates choose to denounce for giving aid to the Rebellion, are to be treated as being themselves a part of *81 the Rebellion,  they are public enemies, and therefore they may be punished without being found guilty by a competent court or a jury. This convenient rule would outlaw every citizen the moment he is charged with a political offence. But political offenders are precisely the class of persons who most need the protection of a court and jury, for the prosecutions against them are most likely to be unfounded both in fact and in law. Whether innocent or guilty, to accuse is to convict them before the men who generally sit in military courts. But this court decided in the Prize Cases that all who live in the enemy's territory are public enemies, without regard to their personal sentiments or conduct; and the converse of the proposition is equally true,  that all who reside inside of our own territory are to be treated as under the protection of the law. If they help the enemy they are criminals, but they cannot be punished without legal conviction.
You have heard much, and you will hear more, concerning the natural and inherent right of the government to defend itself without regard to law. This is fallacious. In a despotism the autocrat is unrestricted in the means he may use for the defence of his authority against the opposition of his own subjects or others; and that is what makes him a despot. But in a limited monarchy the prince must confine himself to a legal defence of his government. If he goes beyond that, and commits aggressions on the rights of the people, he breaks the social compact, releases his subjects from all their obligations to him, renders himself liable to be dragged to the block or driven into exile. A violation of law on pretence of saving such a government as ours is not self-preservation, but suicide.
Salus populi suprema lex. This is true; but it is the safety of the people, not the safety of the ruler, which is the supreme law. The maxim is revolutionary and expresses simply the right to resist tyranny without regard to prescribed forms. It can never be used to stretch the powers of government against the people.
But this government of ours has power to defend itself *82 without violating its own laws; it does not carry the seeds of destruction in its own bosom. It is clothed from head to foot in a panoply of defensive armor. What are the perils which may threaten its existence? I am not able at this moment to think of more than these, which I am about to mention: foreign invasion, domestic insurrection, mutiny in the army and navy, corruption in the civil administration, and last, but not least, criminal violations of its laws committed by individuals among the body of the people. Have we not a legal mode of defence against all these? Military force repels invasion and suppresses insurrection; you preserve discipline in the army and navy by means of courts-martial; you preserve the purity of the civil administration by impeaching dishonest magistrates; and crimes are prevented and punished by the regular judicial authorities. You are not compelled to use these weapons against your enemies, merely because they and they only are justified by the law; you ought to use them because they are more efficient than any other, and less liable to be abused.
There is another view of the subject which settles all controversy about it. No human being in this country can exercise any kind of public authority which is not conferred by law; and under the United States it must be given by the express words of a written statute. Whatever is not so given is withheld, and the exercise of it is positively prohibited. Courts-martial in the army and navy are authorized; they are legal institutions; their jurisdiction is limited, and their whole code of procedure is regulated by act of Congress. Upon the civil courts all the jurisdiction they have or can have is bestowed by law, and if one of them goes beyond what is written its action is ultra vires and void. But a military commission is not a court-martial, and it is not a civil court. It is not governed by the law which is made for either, and it has no law of its own. Its terrible authority is undefined, and its exercise is without any legal control. Undelegated power is always unlimited. The field that lies outside of the Constitution and laws has no boundary. So these commissions have no legal origin and no *83 legal name by which they are known among the children of men; no law applies to them; and they exercise all power for the paradoxical reason that none belongs to them rightfully.
How is a military commission organized? What shall be the number and rank of its members? What offences come within its jurisdiction? What is its code of procedure? How shall witnesses be compelled to attend it? Is it perjury for a witness to swear falsely? What is the function of the judge-advocate? Does he tell the members how they must find, or does he only persuade them to convict? Is he the agent of the government, to command them what evidence they shall admit and what sentence they shall pronounce; or does he always carry his point, right or wrong, by the mere force of eloquence and ingenuity? What is the nature of their punishments? May they confiscate property and levy fines as well as imprison and kill? In addition to strangling their victim, may they also deny him the last consolations of religion, and refuse his family the melancholy privilege of giving him a decent grave?
To none of these questions can the Attorney-General or any one make a reply, for there is no law on the subject.
The power exercised through these military commissions is not only unregulated by law but it is incapable of being so regulated. It asserts the right of the executive government, without the intervention of the judiciary, to capture, imprison, and kill any person to whom that government or its paid dependents may choose to impute an offence. This, in its very essence, is despotic and lawless. It is never claimed or tolerated except by those governments which deny the restraints of all law. It operates in different ways; the instruments which it uses are not always the same; it hides its hideous features under many disguises; it assumes every variety of form. But in all its mutations of outward appearance it is still identical in principle, object, and origin. It is always the same great engine of despotism which Hamilton described it to be.
We cannot help but see that military commissions, if *84 suffered to go on, will be used for pernicious purposes. I have made no allusion to their history in the last five years. But what can be the meaning of an effort to maintain them among us? Certainly not to punish actual guilt. All the ends of true justice are attained by the prompt, speedy, impartial trial which the courts are bound to give. Is there any danger that crime will be winked upon by the judges? Does anybody pretend that courts and juries have less ability to decide upon facts and law than the men who sit in military tribunals? What just purpose, then, can they serve? None.
But while they are powerless to do good, they may become omnipotent to trample upon innocence, to gag the truth, to silence patriotism, and crush the liberties of the country. They would be organized to convict, and the conviction would follow the accusation as surely as night follows the day. A government, of course, will accuse none before such a commission except those whom it predetermines to destroy. The accuser can choose the judges, and will select those who are known to be ignorant, unprincipled, and the most ready to do whatever may please the power which gives them pay and promotion. The willing witness could be found as easily as the superserviceable judge. The treacherous spy and the base informer would stock such a market with abundant perjury; for the authorities that employ them will be bound to protect as well as reward them. A corrupt and tyrannical government, with such an engine at its command, would shock the world with the enormity of its crimes.

ON THE SIDE OF THE UNITED STATES. REPLY.
Mr. Butler:
What are the exact facts set forth in the record, and what the exact question raised by it?
The facts of the case are all in the relator's petition and the exhibits thereto attached, and must, for the purposes of this hearing, be taken to be indisputably true; at least as against him. He is estopped to deny his own showing. Now, every specification upon which the petitioner was tried *85 by the military commission concludes with this averment: "This, on or about," &c.,  the different time and place as applied to the different parties  "at or near Indianapolis, Indiana," or wherever else it may be, "a State within the military lines of the army of the United States, and the theatre of military operations, and which had been and was constantly threatened to be invaded by the enemy."
It may be said that these specifications are only the averments of the government against the relator. But they, in fact, are a part of the exhibits of the relator, upon which he seeks relief; are an integral part of the case presented by him, and cannot be controlled by the pretence set up on the other side, that the court should take judicial notice of the contrary. Judicial cognizance of a fact, by the court, as a matter of public notoriety, or of history, is only a mode of proof of the fact; but no proof can be heard, in behalf of the relator, in contradiction of the record.
Therefore, what we at the bar must discuss, and what the court must decide, is, what law is applicable to a theatre of military operations, within the lines of an army, in a State which has been and constantly is threatened with invasion.
Yet a large portion of the argument on the other side has proceeded on an assumption which is itself a denial of the facts stated upon the record. The fact that military operations were being carried on in Indiana, at the places where these occurrences are said to have taken place, is a question that opposite counsel desire to argue, and desire farther that the court should take judicial notice that the fact was not as stated by the record.
Is the question, then, before this court, one of law or of fact? The matter becomes exceedingly important. We do freely agree, that if at the time of these occurrences there were no military operations in Indiana, if there was no army there, if there was no necessity of armed forces there, if there was no need of a military commission there, if there was nothing there on which the war power of the United States could attach itself, then this commission had no jurisdiction to deal with the relator, and the question proposed *86 may as well at once be answered in the negative. What, then, is the state of facts brought here by the record? For, whatever question may have divided the learned judges in the court below, we here at the bar are divided toto clo upon a vital question of fact. If the facts are to be assumed as the record presents them, then much of the argument of the other side has been misapplied.
The facts of record should have been questioned, if at all, in the court below. If the fact, stated in the record, of war on the theatre of these events  which in our judgment is a fact conclusive upon the jurisdiction of the military commission  is not admitted, then it is of the greatest importance to the cause that it be ascertained. If that fact was questioned below, some measures should have been taken to ascertain it, before the certificate of division of opinion was sent up. Otherwise the Circuit Court, in defiance of settled practice, and also of the act of 1802, has sent up a case in which material facts are not stated, and there is no jurisdiction under the act to hear.[*] Certainly we at the bar seem to be arguing upon different cases; the one side on the assumption that the acts of Milligan and his trial took place in the midst of a community whose social and legal organization had never been disturbed by any war at all, the other on the assumption that they took place in a theatre of military operations, within the lines of the army, in a State which had been and then was threatened with invasion.
But the very form of question submitted, "whether upon the facts stated in the petition and exhibits, the military commission had jurisdiction to try the several relators in manner and form as set forth;"  not upon any other facts of which the court or anybody else will take notice, or which can be brought to the court in any other way than upon the petition and exhibits,  is conclusive as to the facts or case upon which the argument arises. The question, we therefore repeat  and we pray the court to keep it always in mind  is whether upon the facts stated in the petition and exhibit, the *87 commission had jurisdiction; and the great and determining fact stated, and without which we have no standing in court, is that these acts of Milligan and his felonious associates, took place in the theatre of military operations, within the lines of the army, in a State which had been and then was constantly threatened with invasion. Certainly the learned judges in the court below, being on the ground, were bound to take notice of the facts which then existed in Indiana, and if they were not as alleged in the petition and exhibits, ought to have spread them as they truly were upon the record. Then they would have certified the question to be, whether under that state of facts so known by them, and spread upon the record, the military commission had jurisdiction, and not as they have certified, that the question was whether they had jurisdiction on the state of facts set forth in the relator's petition and exhibits.
The strength of the opposing argument is, that this court is bound to know that the courts of justice in Indiana were open at the time when these occurrences are alleged to have happened. Where is the proper allegation to this effect upon the record, upon which this court is to judge? If the court takes judicial notice that the courts were open, must it not also take judicial notice how, and by whose protection, and by whose permission they were so open? that they were open because the strong arm of the military upheld them; because by that power these Sons of Liberty and Knights of the American Circle, who would have driven them away, were arrested, staid, and punished. If judicial notice is to be taken of the one fact, judicial notice must be taken of the other also;  of the fact, namely, that if the soldiers of the United States, by their arms, had not held the State from intestine domestic foes within, and the attacks of traitors leagued with such without; had not kept the ten thousand rebel prisoners of war confined in the neighborhood from being released by these knights and men of the Order of the Sons of Liberty; there would have been no courts in Indiana, no place in which the Circuit Judge of the United States could sit in peace to administer the law.
*88 If, however, this court will take notice that justice could only be administered in Indiana because of the immediate protection of the bayonet, and therefore by the permission of the commander of her armed forces, to which the safety of the State, its citizens, courts, and homes were committed, then the court will have taken notice of the precise state of facts as to the existence of warlike operations in Indiana, which is spread upon the record, and we are content with the necessary inferences.
As respects precedents. I admit that there is a dearth of precedents bearing on the exact point raised here. Why is this? It is because the facts are unprecedented; because the war out of which they grew is unprecedented also; because the clemency that did not at once strike down armed traitors, who in peaceful communities were seeking to overturn all authority, is equally unprecedented; because the necessity which called forth this exertion of the reserved powers of the government is unprecedented, as well as all the rest. Let opposing counsel show the instance in an enlightened age, in a civilized and Christian country, where almost one-half its citizens undertook, without cause, to overthrow the government, and where coward sympathizers, not daring to join them, plotted in the security given by the protecting arms of the other half to aid such rebellion and treason, and we will perhaps show a precedent for hanging such traitors by military commissions.
This is the value of this case: whenever we are thrown into a war again; whenever, hereafter, we have to defend the life of the nation from dangers which invade it, we shall have set precedents how a nation may preserve itself from self-destruction. In the conduct of the war, and in dealing with the troubles which preceded it, we have been obliged to learn up to these questions; to approach the result step by step.
Opposite counsel (Mr. Black) has admitted that there were dangers which might threaten the life of the nation, and in that case it would be the duty of the nation, and it *89 would be its right, to defend itself. He classed those dangers thus: first, foreign invasion; second, domestic insurrection; third, mutiny in the army and navy; fourth, corruption in civil administration; and last, crimes committed by individuals; and he says further, there were within the Constitution powers sufficient to enable the country to defend itself from each and all these dangers. But there is yet another, a more perilous danger, one from which this country came nearer ruin than it ever came by any or by all others. That danger is imbecility of administration; such an administration as should say that there is no constitutional right in a State to go out of the Union, but that there is no power in the Constitution to coerce a State or her people, if she choose to go out. It is in getting rid of that danger, unenumerated, that we have had to use military power, military orders, martial law, and military commissions.
The same counsel was pleased to put certain questions, difficult as he thinks to be answered, as to the method of proceeding before military commissions; but no suggestion is made upon the record or upon the briefs, that all the proceedings were not regular according to the custom and usages of war. They have all the indicia of regularity. There being then nothing alleged why the proceedings are not regular, we are brought back to the main question.
A portion of the argument on the other side has proceeded upon the mistake, that a military commission is a court, either under, by virtue of, or without the Constitution. It is not a court, and that question was decided not long ago. A military commission, whatever it may be, derives its power and authority wholly from martial law, and by that law, and by military authority only, are its proceedings to be adjudged and reviewed. In Dynes v. Hoover,[*] this was decided by this tribunal in regard to a court-martial. The conclusion was sustained in Ex parte Vallandigham.[]
The last quoted case is like the present. Vallandigham was tried by a military commission, and he invoked the aid *90 of the court to get away from it. Why did not this court then decide, as opposing counsel assert the law to be, that under no possible circumstances can a military commission have any right, power, authority, or jurisdiction? No such decision was made. It was decided that a military commission "is not a court within the meaning of the 14th section of the act of 1789:" that this court has no power to issue a writ of certiorari, or to review or pronounce any opinion upon the proceedings of a military commission; that affirmative words in the Constitution, giving this court original jurisdiction in certain cases must be construed negatively as to all others. Mr. Justice Wayne, in delivering the opinion of the court, says:
In Ex parte Metzger[*] it was "determined that a writ of certiorari could not be allowed to examine a commitment by a district judge, under the treaty between the United States and France, for the reason that the judge exercised a special authority, and that no provision had been made for the revision of his judgment. So does a court of military commission exercise a special authority. In the case before us, it was urged that the decision in Metzger's case had been made upon the ground that the proceeding of the district judge was not judicial in its character, but that the proceedings of the military commission were so; and further, it was said that the ruling in that case had been overruled by a majority of the judges in Raine's case. There is a misapprehension of the report of the latter case, and as to the judicial character of the proceedings of the military commission, we cite what was said by this court in the case of The United States v. Ferreira.[]
"The powers conferred by Congress upon the district judge and the secretary are judicial in their nature, for judgment and discretion must be exercised by both of them; but it is not judicial in either case, in the sense in which judicial power is granted to the courts of the United States. Nor can it be said that the authority to be exercised by a military commission is judicial in that sense. It involves discretion to examine, to decide, and sentence, but there is no original jurisdiction in the Supreme *91 Court to issue a writ of habeas corpus ad subjiciendum, to review or reverse its proceedings, or the writ of certiorari to revise the proceedings of a military commission."
Under such language there is an end of this case.
We have already stated that military commissions obtain their jurisdiction from martial law. What, then, is martial law? We have also already defined it.[*] But our definition has not been observed. Counsel treat it as if we would set up the absolutely unregulated, arbitrary, and unjust caprice of a commanding and despotic officer. Let us restate and analyze it. "Martial law is the will of the commanding officer of an armed force or of a geographical military department, expressed in time of war, within the limits of his military jurisdiction, as necessity demands and prudence dictates, restrained or enlarged by the orders of his military or supreme executive chief." This definition is substantially taken from the despatches of the Duke of Wellington. When he was called upon to answer a complaint in Parliament for this exercise of military jurisdiction and martial law in Spain, he thus defined it.[] On another occasion, when speaking of Viscount Torrington's administration as military governor of Ceylon, he said thus:
"The general who declared martial law, and commanded that it should be carried into execution, was bound to lay down distinctly the rules, and regulations, and limits according to which his will was to be carried out. Now he had, in another country, carried on martial law; that was to say, he had governed a large proportion of the population of a country, by his own will. But, then, what did he do? He declared that the country should be governed according to its own national laws, and he carried into execution that will. He governed the country strictly by the laws of the country; and he governed it with such moderation, he must say, that political servants and judges, who at first had fled or had been expelled, afterwards consented to act under his *92 direction. The judges sat in the courts of law, conducting their judicial business and administering the law under his direction."
It is the will of the commanding officer. Being to be exercised upon the instant, it can have no other source. The commanding officer of an armed force, is another element of the definition.
Martial law must have another distinguishing quality. It must be the will of the commander, exercised under the limitations mentioned in time of war, and that is a portion of the definition which is fatal to the authorities read by my brother Garfield, as I shall show.
When is it to be exercised? "When necessity demands and prudence dictates." That is to say, in carrying on war, when in the judgment of him to whom the country has intrusted its welfare  whose single word, as commander of the army, can devote to death thousands of its bravest and best sons  we give to him, when necessity demands, the discretion to govern, outside of the ordinary forms and constitutional limits of law, the wicked and disloyal within the military lines.
In time of war, to save the country's life, you send forth your brothers, your sons, and put them under the command, under the arbitrary will of a general to dispose of their persons and lives as he pleases; but if, for the same purpose, he touches a Milligan, a Son of Liberty, the Constitution is invoked in his behalf  and we are told that the fabric of civil government is about to fall! We submit that if he is intrusted with the power, the will, the authority to act in the one case, he ought to have sufficient discretion to deal with the other; and that the country will not be so much endangered from the use of both, as it would be if he used the first and not the last.
Martial law is known to our laws; it is constitutional, and was derived from our mother country. De Lolme says:[*]
"In general, it may be laid down as a maxim, that, where the sovereign looks to his army for the security of his person and *93 authority, the same military laws by which this army is kept together, must be extended over the whole nation; not in regard to military duties and exercises, but certainly in regard to all that relates to the respect due to the sovereign and to his orders."
"The martial law, concerning these tender points, must be universal. The jealous regulations, concerning mutiny and contempt of orders, cannot be severely enforced on that part of the nation which secures the subjection of the rest, and enforced, too, through the whole scale of military subordination, from the soldier to the officer, up to the very head of the military system, while the more numerous and inferior part of the people are left to enjoy an unrestrained freedom;  that secret disposition which prompts mankind to resist and counteract their superiors, cannot be surrounded by such formidable checks on one side, and be left to be indulged to a degree of licentiousness and wantonness on the other."
Passing from one of the most learned commentators upon England's Constitution, to one who may be said to have lived our Constitution; who came into life almost as the Constitution came into life; whose father was the second chief executive officer of the nation; conversant with public affairs and executing constitutional law in every department of the government from earliest youth, wielding himself chief executive power, and admitted to be one of the ablest constitutional lawyers of his time  what principles do we find asserted?
Mr. John Quincy Adams, speaking of the effect of war upon the municipal institutions of a country, said:[*]
"Slavery was abolished in Columbia, first, by the Spanish General Morillo, and, secondly, by the American General Bolivar. It was abolished by virtue of a military command given at the head of the army, and the abolition continues to be law to this day. It was abolished by the laws of war, and not by municipal enactments; the power was exercised by military commanders, under instructions, of course, from their respective *94 governments. And here I recur again to the examples of General Jackson. What are you now about in Congress? You are about passing a grant to refund to General Jackson the amount of a certain fine imposed upon him by a judge, under the laws of the State of Louisiana. You are going to refund him the money, with interest; and this you are going to do because the imposition of the fine was unjust. Because General Jackson was acting under the laws of war, and because the moment you place a military commander in a district which is the theatre of war, the laws of war apply to that district."
... . "I might furnish a thousand proofs to show that the pretensions of gentlemen to the sanctity of their municipal institutions under a state of actual invasion and of actual war, whether servile, civil, or foreign, is wholly unfounded, and that the laws of war do, in all such cases, take the precedence."
"I lay this down as the law of nations. I say that the military authority takes for the time the place of all municipal institutions, and slavery among the rest; and that, under that state of things, so far from its being true that the States where slavery exists have the exclusive management of the subject, not only the President of the United States, but the commander of the army has power to order the universal emancipation of the slaves. I have given here more in detail a principle, which I have asserted on this floor before now, and of which I have no more doubt, than that you, sir, occupy that chair. I give it in its development, in order that any gentleman, from any part of the Union, may, if he thinks proper, deny the truth of the position, and may maintain his denial; not by indignation, not by passion and fury, but by sound and sober reasoning from the laws of nations and laws of war. And if my position can be answered and refuted, I shall receive the refutation with pleasure; I shall be glad to listen to reason, aside, as I say, from indignation and passion. And if, by force of reasoning, my understanding can be convinced, I here pledge myself to recant what I have asserted."
The case of General Jackson's fine was the test case of martial law in this country. What were the facts? On the 15th of December, 1814, General Jackson declared martial law within his camp, extending four miles above and four *95 miles below the city. The press murmured, but did not speak out until after there came unofficial news of peace. Then it was said that the declaration of peace, ipso facto, dissolved martial law; that the General had no right to maintain martial law any longer; and murmurs loudly increased. But, the General said, that he had not received any official news of the establishment of peace; and, until it came officially, he should not cease his military operations for safety of the city. Thereupon what happened? One Louallier was arrested by the military, for alleged seditious language, and Judge Hall interposed with his writ of habeas corpus. This was on the 5th of March, 1815. The battle of New Orleans, which substantially removed all danger, was fought on the 8th of January. General Jackson sent his aide-de-camp and arrested Judge Hall. The cry then as now was that the necessity for martial law had ceased; why hold Judge Hall, after the news of peace had come? Why not turn him over to the civil authorities? What next took place? Peace was declared in an official manner; the proclamation of martial law was withdrawn; Judge Hall took his seat on the bench, and his first act was to issue an attachment of contempt for General Jackson, who was accordingly brought before him. When General Jackson offered an explanation of his conduct, the Judge refused to receive it, and fined him $1000. The fine was paid in submission to the law. Years afterwards, Congress proceeded not to excuse, not to explain away that act of General Jackson, declaring martial law, but to justify it. I am surprised to hear it said that nobody justified General Jackson. Whether General Jackson was to be excused or to be justified was the whole question at issue between the parties in Congress. A bill was brought in "to indemnify Major-General Andrew Jackson for damages sustained in the discharge of his official duty." Some who were in the Senate of that day, said: "We will not justify, we will excuse, this action in General Jackson; we move, therefore, to change the title of the bill into a `bill for the relief of General Jackson.'" But Mr. R.J. Walker, speaking for General Jackson, made a minority report, in *96 which he put the whole question upon the ground of justification.[*]
He said:
"That General Jackson, and those united with him in the defence of New Orleans, fully believed this emergency to exist, is beyond all doubt or controversy. If, then, this was the state of the case, it was the duty of General Jackson to have made the arrest; and the act was not merely excusable but justifiable. It was demanded by a great and overruling necessity... . . This great law of necessity  of defence of self, of home, and of country  never was designed to be abrogated by any statute, or by any constitution. This was the law which justified the arrest and detention of the prisoner; and, however the act may now be assailed, it has long since received the cordial approbation of the American people. That General Jackson never desired to elevate the military above the civil authority is proved by his conduct during the trial, and after the imposition of this fine."
"The title of the bill is in strict conformity with the facts of the case, and, in the opinion of the undersigned, should be retained. The country demands that his money shall be returned as an act of justice. It was a penalty incurred for saving the country, and the country requires that it shall be restored."
The fine was returned with interest.
The case of Johnson v. Duncan, in the Supreme Court of Louisiana, and cited on the other side, was decided by judges sitting under the excitement of the collision between the military and the judges. As an authority it is of no value. The case of Luther v. Borden, in which Mr. Justice Woodbury's dissenting opinion, strange to say, has been cited by my brother Garfield against the opinion of the court, decides that martial law did obtain in Rhode Island, and sustains General Jackson.
The court say:
"If the government of Rhode Island deemed the armed opposition *97 so formidable, and so ramified throughout the State, as to require the use of its military force and the declaration of martial law, we see no ground upon which this court can question its authority. It was a state of war; and the established government resorted to the rights and usages of war to maintain itself, and to overcome the unlawful opposition. And in that state of things the officers engaged in its military service might lawfully arrest any one, who from the information before them, they had reasonable grounds to believe was engaged in the insurrection, and might order a house to be forcibly entered and searched, when there were reasonable grounds for supposing he might be there concealed."
We have put in our definition of martial law the words, "in time of war," tempore belli. That portion of the definition answers every question, as to when this law may obtain.
Now what was the Earl of Lancaster's case, quoted and so much relied on by the other side? The earl raised a rebellion; and was condemned and executed by sentence of a court-martial, after the rebellion had been subdued. Thereupon his brother brought a writ of error, by leave of the king, before the king himself in Parliament, for the purpose of reversing the judgment and obtaining his lands, and among the errors assigned, was this:
"Yet the said Earl Thomas, &c., was taken in time of peace, and brought before the king himself; and the said our lord and father the king, &c., remembered that the same Thomas was guilty of the seditions and other felonies in the aforesaid contained; without this, that he arraigned him therefor, or put him to answer as is the custom according to the law, &c., and thus, without arraignment and answer, the same Thomas, of error and contrary to the law of the land, was in time of peace adjudged to death, notwithstanding that it is notorious and manifest that the whole time in which the said misdeeds and crimes contained in the said record and proceedings were charged against the said earl, and also the time in which he was taken, and in which our said lord and father the king remembered him to be guilty, &c., and in which he was adjudged to death, was a time of peace, and the more especially as throughout the whole time, aforesaid, *98 the Chancery and other courts of pleas of our lord the king were open, and in which right was done to every man, as it used to be; nor did the same lord the king in that time ever side with standard unfurled; the said lord and father the king, &c., in such time of peace ought not against the same earl, thus to have remembered nor to have adjudged him to death, without arraignment and answer."
So that the whole record turned upon the question whether the rebellion being ended, peace having come, the Earl of Lancaster was liable to be adjudged by military commission in time of peace, and it was held that that was against common right.
The Petition of Right is referred to; but it was not, as is supposed, because of the ship-money and the trial of Hampden and others, that this great petition was passed. It was because King Charles had quartered in the town of Plymouth, and in the County of Devon, certain soldiers in time of peace, upon the inhabitants thereof; and had issued his commission that those counties should be governed by "martial law," while the soldiers, in time of peace, were quartered there, and therefore came the Petition cited; and it was adjudged that military commissions, issued in time of peace, should never have place in the law of England; and all the people to that, even to this day, heartily agree.[*]
Governor Wall's case shows truly that martial law did not protect him for his action under it; but if there ever was a judicial murder, a case where a man, without cause and without right, was put to death, this was the case. Lord Chief Justice Campbell, speaking of it, says:[]
"The prosecution brought great popularity to the Attorney-General and the government of which he was the organ, upon the supposition that it presented a striking display of the stern impartiality of British jurisprudence; but after a calm review of the evidence, I fear it will rather be considered by posterity *99 as an instance of the triumph of vulgar prejudice over humanity and justice."
Another case cited is that of the Rev. John Smith, of Demerara, who was tried and convicted by a court-martial, for inciting negroes to mutiny in Demerara, six weeks after a rebellion was wholly quelled, and when there seems to have been no necessity for such proceedings, nor any reason that they should be carried on. The excuse of the governor was, that the planters were so infuriated against Mr. Smith that he thought that trying him by court-martial would secure him better justice. I agree that this was no excuse, that no necessity here existed. Brougham and Mackintosh brought all their eloquence to overturn martial law. Their words have been cited; but the other side forgot to state that upon a division of the House of Commons, Brougham and Mackintosh were in a minority of forty-six. So that after a deliberate argument of many days, the great final tribunal of English justice decided that Mr. John Smith's case was rightly tried under martial law. The case is an authority not for, but against, the side which it is cited to support.
It is said that in 1865, Congress refused to pass an act which would throw any discredit on military commissions, or limit their action wherever a rebel or a traitor, secret or open, was to be found upon whom their jurisdiction should operate. If such tribunals for certain purposes were not lawful in the judgment of the House of Representatives; if military commissions had no place in the laws of the land, why the necessity of action by Congress to repeal them?
Reference has been made by opposing counsel to what they consider the views of General Washington; and an argument has been attempted to be drawn from this. Now, the first military commission upon this continent of which there is any record sat by command of Washington himself. Its proceedings were published by order of Congress, and are well known. I refer to André's case. That was not a "court-martial;" there was no order to adjudicate; no finding; *100 no sentence; only a report of facts to General Washington, and then Washington issued the order, in virtue of his authority as commander-in-chief, which condemned André to death.
But we do not stop there. This may be said to have been the exceptional case of a spy. To give, then, another illustration of what Washington thought of the rights of military commanders in the field, attention may be directed to the trial of Joshua Hett Smith. Smith was the man at whose house Arnold and Andre met. He was taken and tried by a military court for treasonable practices. The civil courts were open at Tarrytown, at that time; the British Constitution as adopted by our colonial fathers extended over him, but still Washington tried Smith by a military court. In Chandler's Criminal Trials,[*] Smith gives an account of his interview, when he was first brought before Washington, which I cite in order that the court may understand how the Father of his Country regarded the extent of his powers as military commander. Smith says:
"After as much time had elapsed as I supposed was thought necessary to give me rest from my march, I was conducted into a room, where were standing General Washington in the centre, and on each side General Knox and the Marquis de La Fayette, with Washington's two aides-de-camp, Colonels Harrison and Hamilton. Provoked at the usage I received, I addressed General Washington, and demanded to know for what cause I was brought before him in so ignominious a manner? The General answered, sternly, that I stood before him charged with the blackest treason against the citizens of the United States; that he was authorized, from the evidence in his possession, and from the authority vested in him by Congress, to hang me immediately as a traitor, and that nothing could save me but a candid confession who in the army, or among the citizens at large, were my accomplices in the horrid and nefarious designs I had meditated for the last ten days past."
What now, may I ask, is to be thought of the argument *101 of my opposing brethren, who assert that in civil courts the Constitution does not allow any pressure to be brought upon a man to make him confess, at the same time that they eulogize the military conduct of Washington?
But what redress, it is asked, shall any citizen have if this power  so great, so terrible, and so quick in its effects  is abused? The same and only remedy that he can have whenever power is abused. If that power, under martial law, is used for personal objects of aggrandizement, or revenge; of imprisoning, one hour, any citizen, except when necessity under fair judgment demands, he ought to have an appeal to the courts of the country after peace, for redress of grievance.
It has been said that martial law, and its execution by trials by military commission, is fatal to liberty and the pursuit of happiness; but we are only asking for the exercise of military power, when necessity demands and prudence dictates. If the civil law fails to preserve rights, and to insure safety and tranquillity to the country; if there is no intervention of military power to right wrongs and punish crime, an outraged community will improvise some tribunal for themselves, whose execution shall be as swift and whose punishments shall be as terrible as any exhibition of military power; some tribunal wholly unregulated and which is responsible to no one. We are not without such examples on this continent.
The proclamation of 24th September, 1862,[*] by which the President suspended the privilege of the writ of habeas corpus, and which proclamation was in full force during these proceedings, was within the power of the President, independently of the subsequent act of Congress, to make. Brown v. The United States[] seems full on this point. It says:
"When the legislative authority, to whom the right to declare war is confined, has declared war in its most unlimited manner, the executive authority, to whom the execution of the war is confided, is bound to carry it into effect. He has a discretion *102 vested in him, as to the manner and extent, but he cannot lawfully transcend the rules of warfare established among civilized nations. He cannot lawfully exercise powers or authorize proceedings which the civilized world repudiates and disclaims. The sovereignty, as to declaring war and limiting its effects, rests with the legislature. The sovereignty as to its execution rests with the President."
However, the subsequent act of Congress[*] did ratify what the President did; so that every way the view taken of his powers in the case just quoted stands firm.
And the wisdom of this view appears nowhere more than in the present case. The court, of course, can have no knowledge how extensive was this "Order of Sons of Liberty;" how extensive was the organization of these American Knights in Indiana. It was a secret Order. Its vast extent was not known generally. But the Executive might have known; and if I might step out of the record, I could say that I am aware that he did know, that this Order professed to have one hundred thousand men enrolled in it in the States of Indiana, Ohio, and Illinois, so that no jury could be found to pass upon any case, and that any court-house wherein it had been attempted to try any of the conspirators, would have been destroyed. The President has judged that in this exigency a military tribunal alone could safely act.
We have thus far grounded our case on the great law of nations and of war. Has the Constitution any restraining clause on the power thus derived?
It is argued that the fourth, fifth, and sixth articles to the amendments to the Constitution are limitations of the war-making power; that they were made for a state of war as well as a state of peace, and aimed at the military authority as well as the civil. We have anticipated and partially answered this argument.[] As we observed, by the Constitution, as originally adopted, there was no limitation put upon *103 the war-making powers. It only undertook to limit one incident of the war-making power,  the habeas corpus; and if limit it can be called, observe the way in which that writ is guarded. It is provided that the writ of habeas corpus, in time of peace, shall not be suspended; it shall only be suspended when, "in case of rebellion or invasion, the public safety requires;" that is, in time of war. It seems to have been taken for granted by the Constitution that the writ is to be suspended in time of war because very different rules must then govern. The language of the Constitution is, that it "shall not be suspended except,"  showing that it was supposed that the war-making power would find it necessary to suspend the habeas corpus; and yet no other guard was thrown around it.
By the subsequent amendments there was, as we conceive, but one limitation put upon the war-making power, and that was in regard to the quartering of soldiers in private houses.
In no discussion upon these articles of amendment was there, in any State of the Union, a discussion upon the question, what should be their effect in time of war? Yet every one knew, and must have known, that each article would be inoperative in some cases in time of war. If in some cases, why not in all cases where necessity demands it, and where prudence dictates?
There is, in truth, no other way of construing constitutional provisions, than by the maxim, Singula singulis reddenda. Each provision of the Constitution must be taken to refer to the proper time, as to peace or war, in which it operates, as well as to the proper subject of its provisions.
For instance, the Constitution provides that "no person" shall be deprived of liberty without due process of law. And yet, as we know, whole generations of people in this land  as many as four millions of them at one time  people described in the Constitution by this same word, "persons," have been till lately deprived of liberty ever since the adoption of the Constitution, without any process of law whatever.
The Constitution provides, also, that no "person's" right to bear arms shall be infringed; yet these same people, *104 described elsewhere in the Constitution as "persons," have been deprived of their arms whenever they had them.
If you are going to stand on that letter of the Constitution which is set up by the opposite side in the matter before us, how are we to explain such features in the Constitution, in various provisions in which slaves are called persons, with nothing in the language used to distinguish them from persons who were free.
Mr. Black has said, that the very time when a constitutional provision is wanted, is the time of war, and that in time of war, of civil war especially, and the commotions just before and just after it, the constitutional provisions should be most rigidly enforced. We agree to that; but we assert that, in peace, when there is no commotion, the constitutional provisions should be most rigidly enforced as well. Constitutional provisions, within their application, should be always most rigidly enforced. We do not ask anything outside of or beyond the Constitution. We insist only that the Constitution be interpreted so as to save the nation, and not to let it perish.
We quote again the solemnly expressed opinion of Mr. Adams, in 1836, in another of his speeches:
"In the authority given to Congress by the Constitution of the United States to declare war, all the powers, incident to war, are by necessary implication conferred upon the government of the United States. Now, the powers incidental to war are derived, not from any internal, municipal source, but from the laws and usages of nations. There are, then, in the authority of Congress and the Executive, two classes of powers, altogether different in their nature, and often incompatible with each other,  the war power and the peace power. The peace power is limited by regulation and restraints, by provisions prescribed within the Constitution itself. The war power is limited only by the law and usages of nations. The power is tremendous. It is strictly constitutional, but it breaks down every barrier so anxiously erected for the protection of liberty, property, and life."
It is much insisted on, that the determining question as to the exercise of martial law, is whether the civil courts *105 are in session; but civil courts were in session in this city during the whole of the Rebellion, and yet this city has been nearly the whole time under the martial law. There was martial law in this city, when, in 1864, the rebel chief, Jubal Early, was assaulting it, and when, if this court had been sitting here, it would have been disturbed by the enemy's cannon. Yet courts  ordinary courts  were in session. It does not follow, because the ordinary police machinery is in motion for the repression of ordinary crimes, because the rights between party and party are determined without the active interference of the military in cases where their safety and rights are not involved, that, therefore, martial law must have lost its power.
This exercise of civil power is, however, wholly permissive, and is subordinated to the military power. And whether it is to be exercised or not, is a matter within the discretion of the commander. That is laid down by Wellington,[*] and the same thing is to be found in nearly every instance of the exercise of martial law. The commanders of armies, in such exercise, have been glad, if by possibility they could do so, to have the courts carry on the ordinary operations of justice. But they rarely permit to them jurisdiction over crimes affecting the well-being of the army or the safety of the state.
The determining test is, in the phrase of the old law-books, that "the King's courts are open." But the King's Court, using that phrase for the highest court in the land, should not be open under the permission of martial law. In a constitutional government like ours, the Supreme Court should sit within its own jurisdiction, as one of the three great co-ordinate powers of the government, supreme, untrammelled, uncontrolled, unawed, unswayed, and its decrees should be executed by its own high fiat. The Supreme Court has no superior, and, therefore, it is beneath the office of a judge of that court, inconsistent with the dignity of the tribunal whose robes he wears, that he should sit in any district of *106 country where martial law is the supreme law of the state, and where armed guards protect public tranquillity; where the bayonet has the place of the constable's baton; where the press is restrained by military power, and where a general order construes a statute. On the contrary, we submit that all crimes and misdemeanors, of however high a character, which have occurred during the progress and as a part of the war, however great the criminals, either civil or military, should be tried upon the scene of the offence, and within the theatre of military operations; that justice should be meted out in such cases, by military commissions, through the strong arm of the military law which the offenders have invoked, and to which they have appealed to settle their rights.
We do not desire to exalt the martial above the civil law, or to substitute the necessarily despotic rule of the one, for the mild and healthy restraints of the other. Far otherwise. We demand only, that when the law is silent; when justice is overthrown; when the life of the nation is threatened by foreign foes that league, and wait, and watch without, to unite with domestic foes within, who had seized almost half the territory, and more than half the resources of the government, at the beginning; when the capital is imperilled; when the traitor within plots to bring into its peaceful communities the braver rebel who fights without; when the judge is deposed; when the juries are dispersed; when the sheriff, the executive officer of law, is powerless; when the bayonet is called in as the final arbiter; when on its armed forces the government must rely for all it has of power, authority, and dignity; when the citizen has to look to the same source for everything he has of right in the present, or hope in the future,  then we ask that martial law may prevail, so that the civil law may again live, to the end that this may be a "government of laws and not of men."
At the close of the last term the CHIEF JUSTICE announced the order of the court in this and in two other similar cases (those of Bowles and Horsey) as follows:
*107 1. That on the facts stated in said petition and exhibits a writ of habeas corpus ought to be issued, according to the prayer of the said petitioner.
2. That on the facts stated in the said petition and exhibits the said Milligan ought to be discharged from custody as in said petition is prayed, according to the act of Congress passed March 3d, 1863, entitled, "An act relating to habeas corpus and regulating judicial proceedings in certain cases."
3. That on the facts stated in said petition and exhibits, the military commission mentioned therein had no jurisdiction legally to try and sentence said Milligan in the manner and form as in said petition and exhibits are stated.
At the opening of the present term, opinions were delivered.
Mr. Justice DAVIS delivered the opinion of the court.
On the 10th day of May, 1865, Lambdin P. Milligan presented a petition to the Circuit Court of the United States for the District of Indiana, to be discharged from an alleged unlawful imprisonment. The case made by the petition is this: Milligan is a citizen of the United States; has lived for twenty years in Indiana; and, at the time of the grievances complained of, was not, and never had been in the military or naval service of the United States. On the 5th day of October, 1864, while at home, he was arrested by order of General Alvin P. Hovey, commanding the military district of Indiana; and has ever since been kept in close confinement.
On the 21st day of October, 1864, he was brought before a military commission, convened at Indianapolis, by order of General Hovey, tried on certain charges and specifications; found guilty, and sentenced to be hanged; and the sentence ordered to be executed on Friday, the 19th day of May, 1865.
On the 2d day of January, 1865, after the proceedings of the military commission were at an end, the Circuit Court of the United States for Indiana met at Indianapolis and empanelled a grand jury, who were charged to inquire *108 whether the laws of the United States had been violated; and, if so, to make presentments. The court adjourned on the 27th day of January, having, prior thereto, discharged from further service the grand jury, who did not find any bill of indictment or make any presentment against Milligan for any offence whatever; and, in fact, since his imprisonment, no bill of indictment has been found or presentment made against him by any grand jury of the United States.
Milligan insists that said military commission had no jurisdiction to try him upon the charges preferred, or upon any charges whatever; because he was a citizen of the United States and the State of Indiana, and had not been, since the commencement of the late Rebellion, a resident of any of the States whose citizens were arrayed against the government, and that the right of trial by jury was guaranteed to him by the Constitution of the United States.
The prayer of the petition was, that under the act of Congress, approved March 3d, 1863, entitled, "An act relating to habeas corpus and regulating judicial proceedings in certain cases," he may be brought before the court, and either turned over to the proper civil tribunal to be proceeded against according to the law of the land or discharged from custody altogether.
With the petition were filed the order for the commission, the charges and specifications, the findings of the court, with the order of the War Department reciting that the sentence was approved by the President of the United States, and directing that it be carried into execution without delay. The petition was presented and filed in open court by the counsel for Milligan; at the same time the District Attorney of the United States for Indiana appeared, and, by the agreement of counsel, the application was submitted to the court. The opinions of the judges of the Circuit Court were opposed on three questions, which are certified to the Supreme Court:
1st. "On the facts stated in said petition and exhibits, ought a writ of habeas corpus to be issued?"
*109 2d. "On the facts stated in said petition and exhibits, ought the said Lambdin P. Milligan to be discharged from custody as in said petition prayed?"
3d. "Whether, upon the facts stated in said petition and exhibits, the military commission mentioned therein had jurisdiction legally to try and sentence said Milligan in manner and form as in said petition and exhibits is stated?"
The importance of the main question presented by this record cannot be overstated; for it involves the very framework of the government and the fundamental principles of American liberty.
During the late wicked Rebellion, the temper of the times did not allow that calmness in deliberation and discussion so necessary to a correct conclusion of a purely judicial question. Then, considerations of safety were mingled with the exercise of power; and feelings and interests prevailed which are happily terminated. Now that the public safety is assured, this question, as well as all others, can be discussed and decided without passion or the admixture of any element not required to form a legal judgment. We approach the investigation of this case, fully sensible of the magnitude of the inquiry and the necessity of full and cautious deliberation.
But, we are met with a preliminary objection. It is insisted that the Circuit Court of Indiana had no authority to certify these questions; and that we are without jurisdiction to hear and determine them.
The sixth section of the "Act to amend the judicial system of the United States," approved April 29, 1802, declares "that whenever any question shall occur before a Circuit Court upon which the opinions of the judges shall be opposed, the point upon which the disagreement shall happen, shall, during the same term, upon the request of either party or their counsel, be stated under the direction of the judges and certified under the seal of the court to the Supreme Court at their next session to be held thereafter; and shall by the said court be finally decided: And the decision of the *110 Supreme Court and their order in the premises shall be remitted to the Circuit Court and be there entered of record, and shall have effect according to the nature of the said judgment and order: Provided, That nothing herein contained shall prevent the cause from proceeding, if, in the opinion of the court, further proceedings can be had without prejudice to the merits."
It is under this provision of law, that a Circuit Court has authority to certify any question to the Supreme Court for adjudication. The inquiry, therefore, is, whether the case of Milligan is brought within its terms.
It was admitted at the bar that the Circuit Court had jurisdiction to entertain the application for the writ of habeas corpus and to hear and determine it; and it could not be denied; for the power is expressly given in the 14th section of the Judiciary Act of 1789, as well as in the later act of 1863. Chief Justice Marshall, in Bollman's case,[*] construed this branch of the Judiciary Act to authorize the courts as well as the judges to issue the writ for the purpose of inquiring into the cause of the commitment; and this construction has never been departed from. But, it is maintained with earnestness and ability, that a certificate of division of opinion can occur only in a cause; and, that the proceeding by a party, moving for a writ of habeas corpus, does not become a cause until after the writ has been issued and a return made.
Independently of the provisions of the act of Congress of March 3, 1863, relating to habeas corpus, on which the petitioner bases his claim for relief, and which we will presently consider, can this position be sustained?
It is true, that it is usual for a court, on application for a writ of habeas corpus, to issue the writ, and, on the return, to dispose of the case; but the court can elect to waive the issuing of the writ and consider whether, upon the facts presented in the petition, the prisoner, if brought before it, could be discharged. One of the very points on which the case of Tobias Watkins, reported in 3 Peters,[] turned, was, *111 whether, if the writ was issued, the petitioner would be remanded upon the case which he had made.
The Chief Justice, in delivering the opinion of the court, said: "The cause of imprisonment is shown as fully by the petitioner as it could appear on the return of the writ; consequently the writ ought not to be awarded if the court is satisfied that the prisoner would be remanded to prison."
The judges of the Circuit Court of Indiana were, therefore, warranted by an express decision of this court in refusing the writ, if satisfied that the prisoner on his own showing was rightfully detained.
But it is contended, if they differed about the lawfulness of the imprisonment, and could render no judgment, the prisoner is remediless; and cannot have the disputed question certified under the act of 1802. His remedy is complete by writ of error or appeal, if the court renders a final judgment refusing to discharge him; but if he should be so unfortunate as to be placed in the predicament of having the court divided on the question whether he should live or die, he is hopeless and without remedy. He wishes the vital question settled, not by a single judge at his chambers, but by the highest tribunal known to the Constitution; and yet the privilege is denied him; because the Circuit Court consists of two judges instead of one.
Such a result was not in the contemplation of the legislature of 1802; and the language used by it cannot be construed to mean any such thing. The clause under consideration was introduced to further the ends of justice, by obtaining a speedy settlement of important questions where the judges might be opposed in opinion.
The act of 1802 so changed the judicial system that the Circuit Court, instead of three, was composed of two judges; and, without this provision or a kindred one, if the judges differed, the difference would remain, the question be unsettled, and justice denied. The decisions of this court upon the provisions of this section have been numerous. In United States v. Daniel,[*] the court, in holding that a division *112 of the judges on a motion for a new trial could not be certified, say: "That the question must be one which arises in a cause depending before the court relative to a proceeding belonging to the cause." Testing Milligan's case by this rule of law, is it not apparent that it is rightfully here; and that we are compelled to answer the questions on which the judges below were opposed in opinion? If, in the sense of the law, the proceeding for the writ of habeas corpus was the "cause" of the party applying for it, then it is evident that the "cause" was pending before the court, and that the questions certified arose out of it, belonged to it, and were matters of right and not of discretion.
But it is argued, that the proceeding does not ripen into a cause, until there are two parties to it.
This we deny. It was the cause of Milligan when the petition was presented to the Circuit Court. It would have been the cause of both parties, if the court had issued the writ and brought those who held Milligan in custody before it. Webster defines the word "cause" thus: "A suit or action in court; any legal process which a party institutes to obtain his demand, or by which he seeks his right, or supposed right"  and he says, "this is a legal, scriptural, and popular use of the word, coinciding nearly with case, from cado, and action, from ago, to urge and drive."
In any legal sense, action, suit, and cause, are convertible terms. Milligan supposed he had a right to test the validity of his trial and sentence; and the proceeding which he set in operation for that purpose was his "cause" or "suit." It was the only one by which he could recover his liberty. He was powerless to do more; he could neither instruct the judges nor control their action, and should not suffer, because, without fault of his, they were unable to render a judgment. But, the true meaning to the term "suit" has been given by this court. One of the questions in Weston v. City Council of Charleston,[*] was, whether a writ of prohibition was a suit; and Chief Justice Marshall says: "The *113 term is certainly a comprehensive one, and is understood to apply to any proceeding in a court of justice by which an individual pursues that remedy which the law affords him." Certainly, Milligan pursued the only remedy which the law afforded him.
Again, in Cohens v. Virginia,[*] he says: "In law language a suit is the prosecution of some demand in a court of justice." Also, "To commence a suit is to demand something by the institution of process in a court of justice; and to prosecute the suit is to continue that demand." When Milligan demanded his release by the proceeding relating to habeas corpus, he commenced a suit; and he has since prosecuted it in all the ways known to the law. One of the questions in Holmes v. Jennison et al.[] was, whether under the 25th section of the Judiciary Act a proceeding for a writ of habeas corpus was a "suit." Chief Justice Taney held, that, "if a party is unlawfully imprisoned, the writ of habeas corpus is his appropriate legal remedy. It is his suit in court to recover his liberty." There was much diversity of opinion on another ground of jurisdiction; but that, in the sense of the 25th section of the Judiciary Act, the proceeding by habeas corpus was a suit, was not controverted by any except Baldwin, Justice, and he thought that "suit" and "cause" as used in the section, mean the same thing.
The court do not say, that a return must be made, and the parties appear and begin to try the case before it is a suit. When the petition is filed and the writ prayed for, it is a suit,  the suit of the party making the application. If it is a suit under the 25th section of the Judiciary Act when the proceedings are begun, it is, by all the analogies of the law, equally a suit under the 6th section of the act of 1802.
But it is argued, that there must be two parties to the suit, because the point is to be stated upon the request of "either party or their counsel."
Such a literal and technical construction would defeat the very purpose the legislature had in view, which was to enable *114 any party to bring the case here, when the point in controversy was a matter of right and not of discretion; and the words "either party," in order to prevent a failure of justice, must be construed as words of enlargement, and not of restriction. Although this case is here ex parte, it was not considered by the court below without notice having been given to the party supposed to have an interest in the detention of the prisoner. The statements of the record show that this is not only a fair, but conclusive inference. When the counsel for Milligan presented to the court the petition for the writ of habeas corpus, Mr. Hanna, the District Attorney for Indiana, also appeared; and, by agreement, the application was submitted to the court, who took the case under advisement, and on the next day announced their inability to agree, and made the certificate. It is clear that Mr. Hanna did not represent the petitioner, and why is his appearance entered? It admits of no other solution than this,  that he was informed of the application, and appeared on behalf of the government to contest it. The government was the prosecutor of Milligan, who claimed that his imprisonment was illegal; and sought, in the only way he could, to recover his liberty. The case was a grave one; and the court, unquestionably, directed that the law officer of the government should be informed of it. He very properly appeared, and, as the facts were uncontroverted and the difficulty was in the application of the law, there was no useful purpose to be obtained in issuing the writ. The cause was, therefore, submitted to the court for their consideration and determination.
But Milligan claimed his discharge from custody by virtue of the act of Congress "relating to habeas corpus, and regulating judicial proceedings in certain cases," approved March 3d, 1863. Did that act confer jurisdiction on the Circuit Court of Indiana to hear this case?
In interpreting a law, the motives which must have operated with the legislature in passing it are proper to be considered. This law was passed in a time of great national peril, when our heritage of free government was in danger. *115 An armed rebellion against the national authority, of greater proportions than history affords an example of, was raging; and the public safety required that the privilege of the writ of habeas corpus should be suspended. The President had practically suspended it, and detained suspected persons in custody without trial; but his authority to do this was questioned. It was claimed that Congress alone could exercise this power; and that the legislature, and not the President, should judge of the political considerations on which the right to suspend it rested. The privilege of this great writ had never before been withheld from the citizen; and as the exigence of the times demanded immediate action, it was of the highest importance that the lawfulness of the suspension should be fully established. It was under these circumstances, which were such as to arrest the attention of the country, that this law was passed. The President was authorized by it to suspend the privilege of the writ of habeas corpus, whenever, in his judgment, the public safety required; and he did, by proclamation, bearing date the 15th of September, 1863, reciting, among other things, the authority of this statute, suspend it. The suspension of the writ does not authorize the arrest of any one, but simply denies to one arrested the privilege of this writ in order to obtain his liberty.
It is proper, therefore, to inquire under what circumstances the courts could rightfully refuse to grant this writ, and when the citizen was at liberty to invoke its aid.
The second and third sections of the law are explicit on these points. The language used is plain and direct, and the meaning of the Congress cannot be mistaken. The public safety demanded, if the President thought proper to arrest a suspected person, that he should not be required to give the cause of his detention on return to a writ of habeas corpus. But it was not contemplated that such person should be detained in custody beyond a certain fixed period, unless certain judicial proceedings, known to the common law, were commenced against him. The Secretaries of State and War were directed to furnish to the judges of the courts of the *116 United States, a list of the names of all parties, not prisoners of war, resident in their respective jurisdictions, who then were or afterwards should be held in custody by the authority of the President, and who were citizens of states in which the administration of the laws in the Federal tribunals was unimpaired. After the list was furnished, if a grand jury of the district convened and adjourned, and did not indict or present one of the persons thus named, he was entitled to his discharge; and it was the duty of the judge of the court to order him brought before him to be discharged, if he desired it. The refusal or omission to furnish the list could not operate to the injury of any one who was not indicted or presented by the grand jury; for, if twenty days had elapsed from the time of his arrest and the termination of the session of the grand jury, he was equally entitled to his discharge as if the list were furnished; and any credible person, on petition verified by affidavit, could obtain the judge's order for that purpose.
Milligan, in his application to be released from imprisonment, averred the existence of every fact necessary under the terms of this law to give the Circuit Court of Indiana jurisdiction. If he was detained in custody by the order of the President, otherwise than as a prisoner of war; if he was a citizen of Indiana and had never been in the military or naval service, and the grand jury of the district had met, after he had been arrested, for a period of twenty days, and adjourned without taking any proceedings against him, then the court had the right to entertain his petition and determine the lawfulness of his imprisonment. Because the word "court" is not found in the body of the second section, it was argued at the bar, that the application should have been made to a judge of the court, and not to the court itself; but this is not so, for power is expressly conferred in the last proviso of the section on the court equally with a judge of it to discharge from imprisonment. It was the manifest design of Congress to secure a certain remedy by which any one, deprived of liberty, could obtain it, if there was a judicial failure to find cause of offence against him. Courts are *117 not, always, in session, and can adjourn on the discharge of the grand jury; and before those, who are in confinement, could take proper steps to procure their liberation. To provide for this contingency, authority was given to the judges out of court to grant relief to any party, who could show, that, under the law, he should be no longer restrained of his liberty.
It was insisted that Milligan's case was defective, because it did not state that the list was furnished to the judges; and, therefore, it was impossible to say under which section of the act it was presented.
It is not easy to see how this omission could affect the question of jurisdiction. Milligan could not know that the list was furnished, unless the judges volunteered to tell him; for the law did not require that any record should be made of it or anybody but the judges informed of it. Why aver the fact when the truth of the matter was apparent to the court without an averment? How can Milligan be harmed by the absence of the averment, when he states that he was under arrest for more than sixty days before the court and grand jury, which should have considered his case, met at Indianapolis? It is apparent, therefore; that under the Habeas Corpus Act of 1863 the Circuit Court of Indiana had complete jurisdiction to adjudicate upon this case, and, if the judges could not agree on questions vital to the progress of the cause, they had the authority (as we have shown in a previous part of this opinion), and it was their duty to certify those questions of disagreement to this court for final decision. It was argued that a final decision on the questions presented ought not to be made, because the parties who were directly concerned in the arrest and detention of Milligan, were not before the court; and their rights might be prejudiced by the answer which should be given to those questions. But this court cannot know what return will be made to the writ of habeas corpus when issued; and it is very clear that no one is concluded upon any question that may be raised to that return. In the sense of the law of 1802, which authorized a certificate of division, a final decision *118 means final upon the points certified; final upon the court below, so that it is estopped from any adverse ruling in all the subsequent proceedings of the cause.
But it is said that this case is ended, as the presumption is, that Milligan was hanged in pursuance of the order of the President.
Although we have no judicial information on the subject, yet the inference is that he is alive; for otherwise learned counsel would not appear for him and urge this court to decide his case. It can never be in this country of written constitution and laws, with a judicial department to interpret them, that any chief magistrate would be so far forgetful of his duty, as to order the execution of a man who denied the jurisdiction that tried and convicted him; after his case was before Federal judges with power to decide it, who, being unable to agree on the grave questions involved, had, according to known law, sent it to the Supreme Court of the United States for decision. But even the suggestion is injurious to the Executive, and we dismiss it from further consideration. There is, therefore, nothing to hinder this court from an investigation of the merits of this controversy.
The controlling question in the case is this: Upon the facts stated in Milligan's petition, and the exhibits filed, had the military commission mentioned in it jurisdiction, legally, to try and sentence him? Milligan, not a resident of one of the rebellious states, or a prisoner of war, but a citizen of Indiana for twenty years past, and never in the military or naval service, is, while at his home, arrested by the military power of the United States, imprisoned, and, on certain criminal charges preferred against him, tried, convicted, and sentenced to be hanged by a military commission, organized under the direction of the military commander of the military district of Indiana. Had this tribunal the legal power and authority to try and punish this man?
No graver question was ever considered by this court, nor one which more nearly concerns the rights of the whole *119 people; for it is the birthright of every American citizen when charged with crime, to be tried and punished according to law. The power of punishment is, alone through the means which the laws have provided for that purpose, and if they are ineffectual, there is an immunity from punishment, no matter how great an offender the individual may be, or how much his crimes may have shocked the sense of justice of the country, or endangered its safety. By the protection of the law human rights are secured; withdraw that protection, and they are at the mercy of wicked rulers, or the clamor of an excited people. If there was law to justify this military trial, it is not our province to interfere; if there was not, it is our duty to declare the nullity of the whole proceedings. The decision of this question does not depend on argument or judicial precedents, numerous and highly illustrative as they are. These precedents inform us of the extent of the struggle to preserve liberty and to relieve those in civil life from military trials. The founders of our government were familiar with the history of that struggle; and secured in a written constitution every right which the people had wrested from power during a contest of ages. By that Constitution and the laws authorized by it this question must be determined. The provisions of that instrument on the administration of criminal justice are too plain and direct, to leave room for misconstruction or doubt of their true meaning. Those applicable to this case are found in that clause of the original Constitution which says, "That the trial of all crimes, except in case of impeachment, shall be by jury;' and in the fourth, fifth, and sixth articles of the amendments. The fourth proclaims the right to be secure in person and effects against unreasonable search and seizure; and directs that a judicial warrant shall not issue "without proof of probable cause supported by oath or affirmation." The fifth declares "that no person shall be held to answer for a capital or otherwise infamous crime unless on presentment by a grand jury, except in cases arising in the land or naval forces, or in the militia, when in actual service in time of war or public danger, nor be deprived *120 of life, liberty, or property, without due process of law." And the sixth guarantees the right of trial by jury, in such manner and with such regulations that with upright judges, impartial juries, and an able bar, the innocent will be saved and the guilty punished. It is in these words: "In all criminal prosecutions the accused shall enjoy the right to a speedy and public trial by an impartial jury of the state and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation, to be confronted with the witnesses against him, to have compulsory process for obtaining witnesses in his favor, and to have the assistance of counsel for his defence." These securities for personal liberty thus embodied, were such as wisdom and experience had demonstrated to be necessary for the protection of those accused of crime. And so strong was the sense of the country of their importance, and so jealous were the people that these rights, highly prized, might be denied them by implication, that when the original Constitution was proposed for adoption it encountered severe opposition; and, but for the belief that it would be so amended as to embrace them, it would never have been ratified.
Time has proven the discernment of our ancestors; for even these provisions, expressed in such plain English words, that it would seem the ingenuity of man could not evade them, are now, after the lapse of more than seventy years, sought to be avoided. Those great and good men foresaw that troublous times would arise, when rulers and people would become restive under restraint, and seek by sharp and decisive measures to accomplish ends deemed just and proper; and that the principles of constitutional liberty would be in peril, unless established by irrepealable law. The history of the world had taught them that what was done in the past might be attempted in the future. The Constitution of the United States is a law for rulers and people, equally in war and in peace, and covers with the shield of its protection all classes of men, at all times, *121 and under all circumstances. No doctrine, involving more pernicious consequences, was ever invented by the wit of man than that any of its provisions can be suspended during any of the great exigencies of government. Such a doctrine leads directly to anarchy or despotism, but the theory of necessity on which it is based is false; for the government, within the Constitution, has all the powers granted to it, which are necessary to preserve its existence; as has been happily proved by the result of the great effort to throw off its just authority.
Have any of the rights guaranteed by the Constitution been violated in the case of Milligan? and if so, what are they?
Every trial involves the exercise of judicial power; and from what source did the military commission that tried him derive their authority? Certainly no part of the judicial power of the country was conferred on them; because the Constitution expressly vests it "in one supreme court and such inferior courts as the Congress may from time to time ordain and establish," and it is not pretended that the commission was a court ordained and established by Congress. They cannot justify on the mandate of the President; because he is controlled by law, and has his appropriate sphere of duty, which is to execute, not to make, the laws; and there is "no unwritten criminal code to which resort can be had as a source of jurisdiction."
But it is said that the jurisdiction is complete under the "laws and usages of war."
It can serve no useful purpose to inquire what those laws and usages are, whence they originated, where found, and on whom they operate; they can never be applied to citizens in states which have upheld the authority of the government, and where the courts are open and their process unobstructed. This court has judicial knowledge that in Indiana the Federal authority was always unopposed, and its courts always open to hear criminal accusations and redress grievances; and no usage of war could sanction a military trial there for any offence whatever of a citizen in civil life, in nowise *122 connected with the military service. Congress could grant no such power; and to the honor of our national legislature be it said, it has never been provoked by the state of the country even to attempt its exercise. One of the plainest constitutional provisions was, therefore, infringed when Milligan was tried by a court not ordained and established by Congress, and not composed of judges appointed during good behavior.
Why was he not delivered to the Circuit Court of Indiana to be proceeded against according to law? No reason of necessity could be urged against it; because Congress had declared penalties against the offences charged, provided for their punishment, and directed that court to hear and determine them. And soon after this military tribunal was ended, the Circuit Court met, peacefully transacted its business, and adjourned. It needed no bayonets to protect it, and required no military aid to execute its judgments. It was held in a state, eminently distinguished for patriotism, by judges commissioned during the Rebellion, who were provided with juries, upright, intelligent, and selected by a marshal appointed by the President. The government had no right to conclude that Milligan, if guilty, would not receive in that court merited punishment; for its records disclose that it was constantly engaged in the trial of similar offences, and was never interrupted in its administration of criminal justice. If it was dangerous, in the distracted condition of affairs, to leave Milligan unrestrained of his liberty, because he "conspired against the government, afforded aid and comfort to rebels, and incited the people to insurrection," the law said arrest him, confine him closely, render him powerless to do further mischief; and then present his case to the grand jury of the district, with proofs of his guilt, and, if indicted, try him according to the course of the common law. If this had been done, the Constitution would have been vindicated, the law of 1863 enforced, and the securities for personal liberty preserved and defended.
Another guarantee of freedom was broken when Milligan was denied a trial by jury. The great minds of the country *123 have differed on the correct interpretation to be given to various provisions of the Federal Constitution; and judicial decision has been often invoked to settle their true meaning; but until recently no one ever doubted that the right of trial by jury was fortified in the organic law against the power of attack. It is now assailed; but if ideas can be expressed in words, and language has any meaning, this right  one of the most valuable in a free country  is preserved to every one accused of crime who is not attached to the army, or navy, or militia in actual service. The sixth amendment affirms that "in all criminal prosecutions the accused shall enjoy the right to a speedy and public trial by an impartial jury," language broad enough to embrace all persons and cases; but the fifth, recognizing the necessity of an indictment, or presentment, before any one can be held to answer for high crimes, "excepts cases arising in the land or naval forces, or in the militia, when in actual service, in time of war or public danger;" and the framers of the Constitution, doubtless, meant to limit the right of trial by jury, in the sixth amendment, to those persons who were subject to indictment or presentment in the fifth.
The discipline necessary to the efficiency of the army and navy, required other and swifter modes of trial than are furnished by the common law courts; and, in pursuance of the power conferred by the Constitution, Congress has declared the kinds of trial, and the manner in which they shall be conducted, for offences committed while the party is in the military or naval service. Every one connected with these branches of the public service is amenable to the jurisdiction which Congress has created for their government, and, while thus serving, surrenders his right to be tried by the civil courts. All other persons, citizens of states where the courts are open, if charged with crime, are guaranteed the inestimable privilege of trial by jury. This privilege is a vital principle, underlying the whole administration of criminal justice; it is not held by sufferance, and cannot be frittered away on any plea of state or political necessity. When peace prevails, and the authority of the government is undisputed, *124 there is no difficulty of preserving the safeguards of liberty; for the ordinary modes of trial are never neglected, and no one wishes it otherwise; but if society is disturbed by civil commotion  if the passions of men are aroused and the restraints of law weakened, if not disregarded  these safeguards need, and should receive, the watchful care of those intrusted with the guardianship of the Constitution and laws. In no other way can we transmit to posterity unimpaired the blessings of liberty, consecrated by the sacrifices of the Revolution.
It is claimed that martial law covers with its broad mantle the proceedings of this military commission. The proposition is this: that in a time of war the commander of an armed force (if in his opinion the exigencies of the country demand it, and of which he is to judge), has the power, within the lines of his military district, to suspend all civil rights and their remedies, and subject citizens as well as soldiers to the rule of his will; and in the exercise of his lawful authority cannot be restrained, except by his superior officer or the President of the United States.
If this position is sound to the extent claimed, then when war exists, foreign or domestic, and the country is subdivided into military departments for mere convenience, the commander of one of them can, if he chooses, within his limits, on the plea of necessity, with the approval of the Executive, substitute military force for and to the exclusion of the laws, and punish all persons, as he thinks right and proper, without fixed or certain rules.
The statement of this proposition shows its importance; for, if true, republican government is a failure, and there is an end of liberty regulated by law. Martial law, established on such a basis, destroys every guarantee of the Constitution, and effectually renders the "military independent of and superior to the civil power"  the attempt to do which by the King of Great Britain was deemed by our fathers such an offence, that they assigned it to the world as one of the causes which impelled them to declare their independence. Civil liberty and this kind of martial law cannot endure *125 together; the antagonism is irreconcilable; and, in the conflict, one or the other must perish.
This nation, as experience has proved, cannot always remain at peace, and has no right to expect that it will always have wise and humane rulers, sincerely attached to the principles of the Constitution. Wicked men, ambitious of power, with hatred of liberty and contempt of law, may fill the place once occupied by Washington and Lincoln; and if this right is conceded, and the calamities of war again befall us, the dangers to human liberty are frightful to contemplate. If our fathers had failed to provide for just such a contingency, they would have been false to the trust reposed in them. They knew  the history of the world told them  the nation they were founding, be its existence short or long, would be involved in war; how often or how long continued, human foresight could not tell; and that unlimited power, wherever lodged at such a time, was especially hazardous to freemen. For this, and other equally weighty reasons, they secured the inheritance they had fought to maintain, by incorporating in a written constitution the safeguards which time had proved were essential to its preservation. Not one of these safeguards can the President, or Congress, or the Judiciary disturb, except the one concerning the writ of habeas corpus.
It is essential to the safety of every government that, in a great crisis, like the one we have just passed through, there should be a power somewhere of suspending the writ of habeas corpus. In every war, there are men of previously good character, wicked enough to counsel their fellow-citizens to resist the measures deemed necessary by a good government to sustain its just authority and overthrow its enemies; and their influence may lead to dangerous combinations. In the emergency of the times, an immediate public investigation according to law may not be possible; and yet, the peril to the country may be too imminent to suffer such persons to go at large. Unquestionably, there is then an exigency which demands that the government, if it should see fit in the exercise of a proper discretion to make arrests, should not be required to produce the persons arrested *126 in answer to a writ of habeas corpus. The Constitution goes no further. It does not say after a writ of habeas corpus is denied a citizen, that he shall be tried otherwise than by the course of the common law; if it had intended this result, it was easy by the use of direct words to have accomplished it. The illustrious men who framed that instrument were guarding the foundations of civil liberty against the abuses of unlimited power; they were full of wisdom, and the lessons of history informed them that a trial by an established court, assisted by an impartial jury, was the only sure way of protecting the citizen against oppression and wrong. Knowing this, they limited the suspension to one great right, and left the rest to remain forever inviolable. But, it is insisted that the safety of the country in time of war demands that this broad claim for martial law shall be sustained. If this were true, it could be well said that a country, preserved at the sacrifice of all the cardinal principles of liberty, is not worth the cost of preservation. Happily, it is not so.
It will be borne in mind that this is not a question of the power to proclaim martial law, when war exists in a community and the courts and civil authorities are overthrown. Nor is it a question what rule a military commander, at the head of his army, can impose on states in rebellion to cripple their resources and quell the insurrection. The jurisdiction claimed is much more extensive. The necessities of the service, during the late Rebellion, required that the loyal states should be placed within the limits of certain military districts and commanders appointed in them; and, it is urged, that this, in a military sense, constituted them the theatre of military operations; and, as in this case, Indiana had been and was again threatened with invasion by the enemy, the occasion was furnished to establish martial law. The conclusion does not follow from the premises. If armies were collected in Indiana, they were to be employed in another locality, where the laws were obstructed and the national authority disputed. On her soil there was no hostile foot; if once invaded, that invasion was at an end, and with *127 it all pretext for martial law. Martial law cannot arise from a threatened invasion. The necessity must be actual and present; the invasion real, such as effectually closes the courts and deposes the civil administration.
It is difficult to see how the safety of the country required martial law in Indiana. If any of her citizens were plotting treason, the power of arrest could secure them, until the government was prepared for their trial, when the courts were open and ready to try them. It was as easy to protect witnesses before a civil as a military tribunal; and as there could be no wish to convict, except on sufficient legal evidence, surely an ordained and established court was better able to judge of this than a military tribunal composed of gentlemen not trained to the profession of the law.
It follows, from what has been said on this subject, that there are occasions when martial rule can be properly applied. If, in foreign invasion or civil war, the courts are actually closed, and it is impossible to administer criminal justice according to law, then, on the theatre of active military operations, where war really prevails, there is a necessity to furnish a substitute for the civil authority, thus overthrown, to preserve the safety of the army and society; and as no power is left but the military, it is allowed to govern by martial rule until the laws can have their free course. As necessity creates the rule, so it limits its duration; for, if this government is continued after the courts are reinstated, it is a gross usurpation of power. Martial rule can never exist where the courts are open, and in the proper and unobstructed exercise of their jurisdiction. It is also confined to the locality of actual war. Because, during the late Rebellion it could have been enforced in Virginia, where the national authority was overturned and the courts driven out, it does not follow that it should obtain in Indiana, where that authority was never disputed, and justice was always administered. And so in the case of a foreign invasion, martial rule may become a necessity in one state, when, in another, it would be "mere lawless violence."
*128 We are not without precedents in English and American history illustrating our views of this question; but it is hardly necessary to make particular reference to them.
From the first year of the reign of Edward the Third, when the Parliament of England reversed the attainder of the Earl of Lancaster, because he could have been tried by the courts of the realm, and declared, "that in time of peace no man ought to be adjudged to death for treason or any other offence without being arraigned and held to answer; and that regularly when the king's courts are open it is a time of peace in judgment of law," down to the present day, martial law, as claimed in this case, has been condemned by all respectable English jurists as contrary to the fundamental laws of the land, and subversive of the liberty of the subject.
During the present century, an instructive debate on this question occurred in Parliament, occasioned by the trial and conviction by court-martial, at Demerara, of the Rev. John Smith, a missionary to the negroes, on the alleged ground of aiding and abetting a formidable rebellion in that colony. Those eminent statesmen, Lord Brougham and Sir James Mackintosh, participated in that debate; and denounced the trial as illegal; because it did not appear that the courts of law in Demerara could not try offences, and that "when the laws can act, every other mode of punishing supposed crimes is itself an enormous crime."
So sensitive were our Revolutionary fathers on this subject, although Boston was almost in a state of siege, when General Gage issued his proclamation of martial law, they spoke of it as an "attempt to supersede the course of the common law, and instead thereof to publish and order the use of martial law." The Virginia Assembly, also, denounced a similar measure on the part of Governor Dunmore "as an assumed power, which the king himself cannot exercise; because it annuls the law of the land and introduces the most execrable of all systems, martial law."
In some parts of the country, during the war of 1812, our officers made arbitrary arrests and, by military tribunals, tried citizens who were not in the military service. These arrests *129 and trials, when brought to the notice of the courts, were uniformly condemned as illegal. The cases of Smith v. Shaw and McConnell v. Hampden (reported in 12 Johnson[*]), are illustrations, which we cite, not only for the principles they determine, but on account of the distinguished jurists concerned in the decisions, one of whom for many years occupied a seat on this bench.
It is contended, that Luther v. Borden, decided by this court, is an authority for the claim of martial law advanced in this case. The decision is misapprehended. That case grew out of the attempt in Rhode Island to supersede the old colonial government by a revolutionary proceeding. Rhode Island, until that period, had no other form of local government than the charter granted by King Charles II, in 1663; and as that limited the right of suffrage, and did not provide for its own amendment, many citizens became dissatisfied, because the legislature would not afford the relief in their power; and without the authority of law, formed a new and independent constitution, and proceeded to assert its authority by force of arms. The old government resisted this; and as the rebellion was formidable, called out the militia to subdue it, and passed an act declaring martial law. Borden, in the military service of the old government, broke open the house of Luther, who supported the new, in order to arrest him. Luther brought suit against Borden; and the question was, whether, under the constitution and laws of the state, Borden was justified. This court held that a state "may use its military power to put down an armed insurrection too strong to be controlled by the civil authority;" and, if the legislature of Rhode Island thought the peril so great as to require the use of its military forces and the declaration of martial law, there was no ground on which this court could question its authority; and as Borden acted under military orders of the charter government, which had been recognized by the political power of the country, and was upheld by the state judiciary, he was justified in breaking *130 into and entering Luther's house. This is the extent of the decision. There was no question in issue about the power of declaring martial law under the Federal Constitution, and the court did not consider it necessary even to inquire "to what extent nor under what circumstances that power may by exercised by a state."
We do not deem it important to examine further the adjudged cases; and shall, therefore, conclude without any additional reference to authorities.
To the third question, then, on which the judges below were opposed in opinion, an answer in the negative must be returned.
It is proper to say, although Milligan's trial and conviction by a military commission was illegal, yet, if guilty of the crimes imputed to him, and his guilt had been ascertained by an established court and impartial jury, he deserved severe punishment. Open resistance to the measures deemed necessary to subdue a great rebellion, by those who enjoy the protection of government, and have not the excuse even of prejudice of section to plead in their favor, is wicked; but that resistance becomes an enormous crime when it assumes the form of a secret political organization, armed to oppose the laws, and seeks by stealthy means to introduce the enemies of the country into peaceful communities, there to light the torch of civil war, and thus overthrow the power of the United States. Conspiracies like these, at such a juncture, are extremely perilous; and those concerned in them are dangerous enemies to their country, and should receive the heaviest penalties of the law, as an example to deter others from similar criminal conduct. It is said the severity of the laws caused them; but Congress was obliged to enact severe laws to meet the crisis; and as our highest civil duty is to serve our country when in danger, the late war has proved that rigorous laws, when necessary, will be cheerfully obeyed by a patriotic people, struggling to preserve the rich blessings of a free government.
The two remaining questions in this case must be answered in the affirmative. The suspension of the privilege of the *131 writ of habeas corpus does not suspend the writ itself. The writ issues as a matter of course; and on the return made to it the court decides whether the party applying is denied the right of proceeding any further with it.
If the military trial of Milligan was contrary to law, then he was entitled, on the facts stated in his petition, to be discharged from custody by the terms of the act of Congress of March 3d, 1863. The provisions of this law having been considered in a previous part of this opinion, we will not restate the views there presented. Milligan avers he was a citizen of Indiana, not in the military or naval service, and was detained in close confinement, by order of the President, from the 5th day of October, 1864, until the 2d day of January, 1865, when the Circuit Court for the District of Indiana, with a grand jury, convened in session at Indianapolis; and afterwards, on the 27th day of the same month, adjourned without finding an indictment or presentment against him. If these averments were true (and their truth is conceded for the purposes of this case), the court was required to liberate him on taking certain oaths prescribed by the law, and entering into recognizance for his good behavior.
But it is insisted that Milligan was a prisoner of war, and, therefore, excluded from the privileges of the statute. It is not easy to see how he can be treated as a prisoner of war, when he lived in Indiana for the past twenty years, was arrested there, and had not been, during the late troubles, a resident of any of the states in rebellion. If in Indiana he conspired with bad men to assist the enemy, he is punishable for it in the courts of Indiana; but, when tried for the offence, he cannot plead the rights of war; for he was not engaged in legal acts of hostility against the government, and only such persons, when captured, are prisoners of war. If he cannot enjoy the immunities attaching to the character of a prisoner of war, how can he be subject to their pains and penalties?
This case, as well as the kindred cases of Bowles and Horsey, were disposed of at the last term, and the proper orders were entered of record. There is, therefore, no additional entry required.
*132 The CHIEF JUSTICE delivered the following opinion.
Four members of the court, concurring with their brethren in the order heretofore made in this cause, but unable to concur in some important particulars with the opinion which has just been read, think it their duty to make a separate statement of their views of the whole case.
We do not doubt that the Circuit Court for the District of Indiana had jurisdiction of the petition of Milligan for the writ of habeas corpus.
Whether this court has jurisdiction upon the certificate of division admits of more question. The construction of the act authorizing such certificates, which has hitherto prevailed here, denies jurisdiction in cases where the certificate brings up the whole cause before the court. But none of the adjudicated cases are exactly in point, and we are willing to resolve whatever doubt may exist in favor of the earliest possible answers to questions involving life and liberty. We agree, therefore, that this court may properly answer questions certified in such a case as that before us.
The crimes with which Milligan was charged were of the gravest character, and the petition and exhibits in the record, which must here be taken as true, admit his guilt. But whatever his desert of punishment may be, it is more important to the country and to every citizen that he should not be punished under an illegal sentence, sanctioned by this court of last resort, than that he should be punished at all. The laws which protect the liberties of the whole people must not be violated or set aside in order to inflict, even upon the guilty, unauthorized though merited justice.
The trial and sentence of Milligan were by military commission convened in Indiana during the fall of 1864. The action of the commission had been under consideration by President Lincoln for some time, when he himself became the victim of an abhorred conspiracy. It was approved by his successor in May, 1865, and the sentence was ordered to be carried into execution. The proceedings, therefore, had the fullest sanction of the executive department of the government.
*133 This sanction requires the most respectful and the most careful consideration of this court. The sentence which it supports must not be set aside except upon the clearest conviction that it cannot be reconciled with the Constitution and the constitutional legislation of Congress.
We must inquire, then, what constitutional or statutory provisions have relation to this military proceeding.
The act of Congress of March 3d, 1863, comprises all the legislation which seems to require consideration in this connection. The constitutionality of this act has not been questioned and is not doubted.
The first section authorized the suspension, during the Rebellion, of the writ of habeas corpus throughout the United States by the President. The two next sections limited this authority in important respects.
The second section required that lists of all persons, being citizens of states in which the administration of the laws had continued unimpaired in the Federal courts, who were then held or might thereafter be held as prisoners of the United States, under the authority of the President, otherwise than as prisoners of war, should be furnished to the judges of the Circuit and District Courts. The lists transmitted to the judges were to contain the names of all persons, residing within their respective jurisdictions, charged with violation of national law. And it was required, in cases where the grand jury in attendance upon any of these courts should terminate its session without proceeding by indictment or otherwise against any prisoner named in the list, that the judge of the court should forthwith make an order that such prisoner desiring a discharge, should be brought before him or the court to be discharged, on entering into recognizance, if required, to keep the peace and for good behavior, or to appear, as the court might direct, to be further dealt with according to law. Every officer of the United States having custody of such prisoners was required to obey and execute the judge's order, under penalty, for refusal or delay, of fine and imprisonment.
The third section provided, in case lists of persons other *134 than prisoners of war then held in confinement, or thereafter arrested, should not be furnished within twenty days after the passage of the act, or, in cases of subsequent arrest, within twenty days after the time of arrest, that any citizen, after the termination of a session of the grand jury without indictment or presentment, might, by petition alleging the facts and verified by oath, obtain the judge's order of discharge in favor of any person so imprisoned, on the terms and conditions prescribed in the second section.
It was made the duty of the District Attorney of the United States to attend examinations on petitions for discharge.
It was under this act that Milligan petitioned the Circuit Court for the District of Indiana for discharge from imprisonment.
The holding of the Circuit and District Courts of the United States in Indiana had been uninterrupted. The administration of the laws in the Federal courts had remained unimpaired. Milligan was imprisoned under the authority of the President, and was not a prisoner of war. No list of prisoners had been furnished to the judges, either of the District or Circuit Courts, as required by the law. A grand jury had attended the Circuit Courts of the Indiana district, while Milligan was there imprisoned, and had closed its session without finding any indictment or presentment or otherwise proceeding against the prisoner.
His case was thus brought within the precise letter and intent of the act of Congress, unless it can be said that Milligan was not imprisoned by authority of the President; and nothing of this sort was claimed in argument on the part of the government.
It is clear upon this statement that the Circuit Court was bound to hear Milligan's petition for the writ of habeas corpus, called in the act an order to bring the prisoner before the judge or the court, and to issue the writ, or, in the language of the act, to make the order.
The first question, therefore  Ought the writ to issue?  must be answered in the affirmative.
*135 And it is equally clear that he was entitled to the discharge prayed for.
It must be borne in mind that the prayer of the petition was not for an absolute discharge, but to be delivered from military custody and imprisonment, and if found probably guilty of any offence, to be turned over to the proper tribunal for inquiry and punishment; or, if not found thus probably guilty, to be discharged altogether.
And the express terms of the act of Congress required this action of the court. The prisoner must be discharged on giving such recognizance as the court should require, not only for good behavior, but for appearance, as directed by the court, to answer and be further dealt with according to law.
The first section of the act authorized the suspension of the writ of habeas corpus generally throughout the United States. The second and third sections limited this suspension, in certain cases, within states where the administration of justice by the Federal courts remained unimpaired. In these cases the writ was still to issue, and under it the prisoner was entitled to his discharge by a circuit or district judge or court, unless held to bail for appearance to answer charges. No other judge or court could make an order of discharge under the writ. Except under the circumstances pointed out by the act, neither circuit nor district judge or court could make such an order. But under those circumstances the writ must be issued, and the relief from imprisonment directed by the act must be afforded. The commands of the act were positive, and left no discretion to court or judge.
An affirmative answer must, therefore, be given to the second question, namely: Ought Milligan to be discharged according to the prayer of the petition?
That the third question, namely: Had the military commission in Indiana, under the facts stated, jurisdiction to try and sentence Milligan? must be answered negatively is an unavoidable inference from affirmative answers to the other two.
*136 The military commission could not have jurisdiction to try and sentence Milligan, if he could not be detained in prison under his original arrest or under sentence, after the close of a session of the grand jury without indictment or other proceeding against him.
Indeed, the act seems to have been framed on purpose to secure the trial of all offences of citizens by civil tribunals, in states where these tribunals were not interrupted in the regular exercise of their functions.
Under it, in such states, the privilege of the writ might be suspended. Any person regarded as dangerous to the public safety might be arrested and detained until after the session of a grand jury. Until after such session no person arrested could have the benefit of the writ; and even then no such person could be discharged except on such terms, as to future appearance, as the court might impose. These provisions obviously contemplate no other trial or sentence than that of a civil court, and we could not assert the legality of a trial and sentence by a military commission, under the circumstances specified in the act and described in the petition, without disregarding the plain directions of Congress.
We agree, therefore, that the first two questions certified must receive affirmative answers, and the last a negative. We do not doubt that the positive provisions of the act of Congress require such answers. We do not think it necessary to look beyond these provisions. In them we find sufficient and controlling reasons for our conclusions.
But the opinion which has just been read goes further; and as we understand it, asserts not only that the military commission held in Indiana was not authorized by Congress, but that it was not in the power of Congress to authorize it; from which it may be thought to follow, that Congress has no power to indemnify the officers who composed the commission against liability in civil courts for acting as members of it.
We cannot agree to this.
We agree in the proposition that no department of the *137 government of the United States  neither President, nor Congress, nor the Courts  possesses any power not given by the Constitution.
We assent, fully, to all that is said, in the opinion, of the inestimable value of the trial by jury, and of the other constitutional safeguards of civil liberty. And we concur, also, in what is said of the writ of habeas corpus, and of its suspension, with two reservations: (1.) That, in our judgment, when the writ is suspended, the Executive is authorized to arrest as well as to detain; and (2.) that there are cases in which, the privilege of the writ being suspended, trial and punishment by military commission, in states where civil courts are open, may be authorized by Congress, as well as arrest and detention.
We think that Congress had power, though not exercised, to authorize the military commission which was held in Indiana.
We do not think it necessary to discuss at large the grounds of our conclusions. We will briefly indicate some of them.
The Constitution itself provides for military government as well as for civil government. And we do not understand it to be claimed that the civil safeguards of the Constitution have application in cases within the proper sphere of the former.
What, then, is that proper sphere? Congress has power to raise and support armies; to provide and maintain a navy; to make rules for the government and regulation of the land and naval forces; and to provide for governing such part of the militia as may be in the service of the United States.
It is not denied that the power to make rules for the government of the army and navy is a power to provide for trial and punishment by military courts without a jury. It has been so understood and exercised from the adoption of the Constitution to the present time.
Nor, in our judgment, does the fifth, or any other amendment, abridge that power. "Cases arising in the land and naval forces, or in the militia in actual service in time of war *138 or public danger," are expressly excepted from the fifth amendment, "that no person shall be held to answer for a capital or otherwise infamous crime, unless on a presentment or indictment of a grand jury," and it is admitted that the exception applies to the other amendments as well as to the fifth.
Now, we understand this exception to have the same import and effect as if the powers of Congress in relation to the government of the army and navy and the militia had been recited in the amendment, and cases within those powers had been expressly excepted from its operation. The states, most jealous of encroachments upon the liberties of the citizen, when proposing additional safeguards in the form of amendments, excluded specifically from their effect cases arising in the government of the land and naval forces. Thus Massachusetts proposed that "no person shall be tried for any crime by which he would incur an infamous punishment or loss of life until he be first indicted by a grand jury, except in such cases as may arise in the government and regulation of the land forces." The exception in similar amendments, proposed by New York, Maryland, and Virginia, was in the same or equivalent terms. The amendments proposed by the states were considered by the first Congress, and such as were approved in substance were put in form, and proposed by that body to the states. Among those thus proposed, and subsequently ratified, was that which now stands as the fifth amendment of the Constitution. We cannot doubt that this amendment was intended to have the same force and effect as the amendment proposed by the states. We cannot agree to a construction which will impose on the exception in the fifth amendment a sense other than that obviously indicated by action of the state conventions.
We think, therefore, that the power of Congress, in the government of the land and naval forces and of the militia, is not at all affected by the fifth or any other amendment. It is not necessary to attempt any precise definition of the boundaries of this power. But may it not be said that government *139 includes protection and defence as well as the regulation of internal administration? And is it impossible to imagine cases in which citizens conspiring or attempting the destruction or great injury of the national forces may be subjected by Congress to military trial and punishment in the just exercise of this undoubted constitutional power? Congress is but the agent of the nation, and does not the security of individuals against the abuse of this, as of every other power, depend on the intelligence and virtue of the people, on their zeal for public and private liberty, upon official responsibility secured by law, and upon the frequency of elections, rather than upon doubtful constructions of legislative powers?
But we do not put our opinion, that Congress might authorize such a military commission as was held in Indiana, upon the power to provide for the government of the national forces.
Congress has the power not only to raise and support and govern armies but to declare war. It has, therefore, the power to provide by law for carrying on war. This power necessarily extends to all legislation essential to the prosecution of war with vigor and success, except such as interferes with the command of the forces and the conduct of campaigns. That power and duty belong to the President as commander-in-chief. Both these powers are derived from the Constitution, but neither is defined by that instrument. Their extent must be determined by their nature, and by the principles of our institutions.
The power to make the necessary laws is in Congress; the power to execute in the President. Both powers imply many subordinate and auxiliary powers. Each includes all authorities essential to its due exercise. But neither can the President, in war more than in peace, intrude upon the proper authority of Congress, nor Congress upon the proper authority of the President. Both are servants of the people, whose will is expressed in the fundamental law. Congress cannot direct the conduct of campaigns, nor can the President, *140 or any commander under him, without the sanction of Congress, institute tribunals for the trial and punishment of offences, either of soldiers or civilians, unless in cases of a controlling necessity, which justifies what it compels, or at least insures acts of indemnity from the justice of the legislature.
We by no means assert that Congress can establish and apply the laws of war where no war has been declared or exists.
Where peace exists the laws of peace must prevail. What we do maintain is, that when the nation is involved in war, and some portions of the country are invaded, and all are exposed to invasion, it is within the power of Congress to determine in what states or districts such great and imminent public danger exists as justifies the authorization of military tribunals for the trial of crimes and offences against the discipline or security of the army or against the public safety.
In Indiana, for example, at the time of the arrest of Milligan and his co-conspirators, it is established by the papers in the record, that the state was a military district, was the theatre of military operations, had been actually invaded, and was constantly threatened with invasion. It appears, also, that a powerful secret association, composed of citizens and others, existed within the state, under military organization, conspiring against the draft, and plotting insurrection, the liberation of the prisoners of war at various depots, the seizure of the state and national arsenals, armed co-operation with the enemy, and war against the national government.
We cannot doubt that, in such a time of public danger, Congress had power, under the Constitution, to provide for the organization of a military commission, and for trial by that commission of persons engaged in this conspiracy. The fact that the Federal courts were open was regarded by Congress as a sufficient reason for not exercising the power; but that fact could not deprive Congress of the right to exercise it. Those courts might be open and undisturbed in the execution *141 of their functions, and yet wholly incompetent to avert threatened danger, or to punish, with adequate promptitude and certainty, the guilty conspirators.
In Indiana, the judges and officers of the courts were loyal to the government. But it might have been otherwise. In times of rebellion and civil war it may often happen, indeed, that judges and marshals will be in active sympathy with the rebels, and courts their most efficient allies.
We have confined ourselves to the question of power. It was for Congress to determine the question of expediency. And Congress did determine it. That body did not see fit to authorize trials by military commission in Indiana, but by the strongest implication prohibited them. With that prohibition we are satisfied, and should have remained silent if the answers to the questions certified had been put on that ground, without denial of the existence of a power which we believe to be constitutional and important to the public safety,  a denial which, as we have already suggested, seems to draw in question the power of Congress to protect from prosecution the members of military commissions who acted in obedience to their superior officers, and whose action, whether warranted by law or not, was approved by that upright and patriotic President under whose administration the Republic was rescued from threatened destruction.
We have thus far said little of martial law, nor do we propose to say much. What we have already said sufficiently indicates our opinion that there is no law for the government of the citizens, the armies or the navy of the United States, within American jurisdiction, which is not contained in or derived from the Constitution. And wherever our army or navy may go beyond our territorial limits, neither can go beyond the authority of the President or the legislation of Congress.
There are under the Constitution three kinds of military jurisdiction: one to be exercised both in peace and war; another to be exercised in time of foreign war without the boundaries of the United States, or in time of rebellion and civil war within states or districts occupied by rebels treated *142 as belligerents; and a third to be exercised in time of invasion or insurrection within the limits of the United States, or during rebellion within the limits of states maintaining adhesion to the National Government, when the public danger requires its exercise. The first of these may be called jurisdiction under MILITARY LAW, and is found in acts of Congress prescribing rules and articles of war, or otherwise providing for the government of the national forces; the second may be distinguished as MILITARY GOVERNMENT, superseding, as far as may be deemed expedient, the local law, and exercised by the military commander under the direction of the President, with the express or implied sanction of Congress; while the third may be denominated MARTIAL LAW PROPER, and is called into action by Congress, or temporarily, when the action of Congress cannot be invited, and in the case of justifying or excusing peril, by the President, in times of insurrection or invasion, or of civil or foreign war, within districts or localities where ordinary law no longer adequately secures public safety and private rights.
We think that the power of Congress, in such times and in such localities, to authorize trials for crimes against the security and safety of the national forces, may be derived from its constitutional authority to raise and support armies and to declare war, if not from its constitutional authority to provide for governing the national forces.
We have no apprehension that this power, under our American system of government, in which all official authority is derived from the people, and exercised under direct responsibility to the people, is more likely to be abused than the power to regulate commerce, or the power to borrow money. And we are unwilling to give our assent by silence to expressions of opinion which seem to us calculated, though not intended, to cripple the constitutional powers of the government, and to augment the public dangers in times of invasion and rebellion.
Mr. Justice WAYNE, Mr. Justice SWAYNE, and Mr. Justice MILLER concur with me in these views.
NOTES
[*] United States v. Daniel, 6 Wheaton, 542; Davis v. Braden, 10 Peters, 289.
[*] 6 Wheaton, 548; 10 Peters, 290.
[] Wilson v. Barnum, 8 Howard, 262.
[] United States v. City Bank of Columbus, 19 Id. 385.
[*] Commonwealth v. Chandler, 11 Massachusetts, 83.
[] Dynes v. Hoover, 20 Howard, 78; Ex parte Vallandigham, 1 Wallace, 243.
[*] Hansard's Parliamentary Debates, 3d series, vol. 95, p. 80. Speech of the Duke of Wellington. Opinions of Attorneys-General, vol. 8, p. 367.
[] Kent's Commentaries, vol. 1, p. 341, note A.
[*] Examination of Major André before board of officers, Colonial pamphlets, vol. 18.
[*] Brown v. The United States, 8 Cranch, 153.
[*] Luther v. Borden, 7 Howard, 42-45; Martin v. Mott, 12 Wheaton, 19.
[*] Federalist, No. 26, by Hamilton; No. 41, by Madison.
[*] 4 Cranch, 75.
[*] 14 Peters, 566.
[*] 26 Pennsylvania State, 9.
[] 1 Burrow, 765.
[] 2 W. Dlackstone, 1324.
[§] 3 Barnewall and Alderson, 420.
[] 1 Johnson's Cases, 136.
[¶] 9 Id. 239.
[**] 3 Peters, 202.
[*] 10 Peters, 289.
[*] 1 Black, 583.
[*] Const., Art. 4, § 4.
[*] See Mills v. Martin, 19 Johnson, 70; Martin v. Mott, 12 Wheaton, 19 1 Kent's Com.. 370, note.
[*] 19 Johnson, 7.
[*] And see Houston v. Moore, 5 Wheaton, 1.
[] O'Brien's Military Law, pp. 222-225.
[*] McArthur on Courts-Martial, vol. i, pp. 268-271. See also London Gazette for 1745-6, Library of Congress.
[*] 7 Hill, 95.
[] 20 Howard, 82.
[*] Runnington's edition, London, 1820, pp. 42-3; and see 1 Blackstone's Com. 413-14.
[*] Hale's Pleas of the Crown, pp. 499, 500; Hume, vol. 1, p. 159.
[*] 28 State Trials, p. 51; see also Hough's Military Law, pp. 537-540.
[] 7 Howard, p. 65. See also Annual Register for 1775, p. 133.
[] In his dissenting opinion.
[§] See argument of Mr. Field. Supra, p. 37-8.  REP.
[*] See 3 Martin's Louisiana Rep., O.S., 520.
[*] Benton's Abridgment of Debates, vol. 14, page 628.
[*] Mackintosh's Miscellaneous Works, p. 734, London edition, 1851
[*] Pages 131, 133.
[*] Vol. 2, pp. 191-202.
[*] See Johnson v. Duncan, in the Supreme Court of Louisiana, already referred to by General Garfield, supra, p. 52; the case of General Jackson's fine.
[*] See remarks of Mr. Stanbery, supra, p. 12.
[*] 20 Howard, 781.
[] 1 Wallace, 243.
[*] 5 Howard, 176.
[] 13 Id. 48.
[*] Supra, p. 14.
[] Hansard's Parliamentary Debates, 3d Series, vol. 14, p. 879; and see, also, Opinions of the Attorneys-General, vol. 8, p. 366.
[*] De Lolme, Stephens' ed. of 1838, p. 972.
[*] A.D. 1842. Records and Speeches, p. 84.
[*] Benton's Condensed Debates, vol. 14, p. 641.
[*] Hale's Pleas of the Crown, 42.
[] Lives of the Chief Justices; Life of Ellenborough.
[*] Vol. 2, p. 248.
[*] See supra, pp. 15-16.
[] 8 Cranch, 153.
[*] See supra, p. 4.
[] See supra, pp. 20-21.
[*] See supra, p. 91-2.
[*] 4 Cranch, 75.
[] Page 193.
[*] 6 Wheaton, 542.
[*] 2 Peters, 449.
[*] 6 Wheaton, 264.
[] 14 Peters, 540.
[*] Pages 257 and 234.